**URRUTIA v. PATINO et al. (No. 7791.)**

Court of Civil Appeals of Texas. San Antonio. May 25, 1927.

Rehearing Denied July 16, 1927.

1. **Appeal and error** ⬤=1078(1)—**Assignments of error, not urged or named, are assumed waived.**

Assignments of error, not named or urged, are assumed to be waived.

2. **Physicians and surgeons** ⬤=18(6)—**Plaintiffs suing for death of patient had burden of proving treatment was improper and contributed to patient's death.**

In suit against physician to recover damages for death of patient burden of proving contentions that patient was not suffering with syphilis, for which he was treated, had never so suffered, that treatment given by physician was improper, and that it contributed to his death was on plaintiffs.

3. **Physicians and surgeons** ⬤=18(8)—**Finding of negligence in treating patient for syphilis without making Wasserman test held against positive testimony test was made.**

In suit against physician alleged to have improperly treated patient for syphilis, which plaintiffs claimed patient did not have, contrib-

uting to his death, finding by jury that physician failed to make Wasserman test in ascertaining patient's illness as ground of alleged negligence *held* against positive testimony that such test was made.

**4. Physicians and surgeons ☞12—Physician cannot be charged with neglect after discharge.**

Where physician refused to follow up case from his office and was discharged, he cannot thereafter be charged with negligence.

**5. Physicians and surgeons ☞12—Physician may properly refuse to treat patients not coming to office.**

Physician is within his rights in refusing to leave his office in accordance with his practice of treating only patients who came to his office, and wife of patient was within her rights in securing another competent physician without consulting first physician.

**6. Physicians and surgeons ☞18(8)—Plaintiff held not to have sustained burden of proving treatment for syphilis caused patient's death.**

In suit against physician to recover damages for death of patient, alleged to have been caused by improper treatment for syphilis, which plaintiff claimed patient did not have, plaintiff did not sustain burden of showing that physician's treatment was proximate cause of patient's death, under evidence by physicians showing that injections given were proper.

**7. Physicians and surgeons ☞12—Relations between physician and patient may be terminated at will of either party.**

Professional relations between physician and patient are merely contractual and may ordinarily be terminated at will of either party.

**8. Physicians and surgeons ☞12—Physician is under duty to treat patient so long as professional relations exist.**

So long as professional relations between physician and patient last, it is duty of physician to treat patient.

**9. Physicians and surgeons ☞15—Physician treating only patients coming to office held not negligent in refusing to go to home of patient.**

Where patient visited physician for treatment at latter's hospital, and physician confined his practice only to patients visiting him at his office, physician could not be said to have been negligent in refusing to go to patient's home to treat him, especially where physician was discharged and services of another competent physician secured.

**10. Physicians and surgeons ☞12—Requested charge to find physician was not negligent in failing to attend patient at his home if patient's family discharged physician held erroneously refused.**

In action against physician to recover damages for death of patient alleged to have been improperly treated for disease, which patient is claimed not to have had, requested charge to find physician not negligent in failing to attend patient at latter's home if physician did not visit patients outside office, and was discharged by family notified thereof, and securing another physician, *held* erroneously refused, where it was not shown that patient could not have been carried to physician's hospital.

Appeal from District Court, Bexar County; Robt. W. B. Terrell, Judge.

Suit by Mrs. Trinidad Patino, for herself and next friend, Viola Patino, and another, against Dr. Aureliano Urrutia. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

Ball & Seeligson, Hicks, Hicks, Dickson & Bobbitt, Ed. H. Lange, and Hertzberg & Kercheville, all of San Antonio, for appellant.

Newton & Woods, of San Antonio, for appellees.

COBBS, J. This suit is brought by appellee Mrs. Trinidad Patino for herself and next friend, Viola Patino, and Olga Patino, the mother of the children of herself and her deceased husband, Edward M. Patino, who sues appellant, a regular practicing licensed physician and surgeon in San Antonio, Bexar county, Tex., for damages, alleging:

"That about the 1st of June, 1925, Edward M. Patino, deceased, was slightly indisposed because of an occasional, uncomfortable sensation in his stomach and called upon the appellant to give him medical treatment, and that appellant made such examinations as appellant cared to make on Edward M. Patino, but made no Wasserman test at the time. That after making an examination appellant informed the deceased that he was suffering from a disordered stomach, and gave deceased certain pills to take. That appellant continued to treat the deceased with such pills until about July 17, 1925, when appellant informed the deceased that deceased was suffering from syphilis, and that it would be necessary to give him an injection therefor, which he then did, and that appellant administered a second injection to deceased about July 23, 1925, the name and nature of the ingredients of which injections were unknown to plaintiffs, but which were of a powerful and dangerous nature, and that shortly after the giving of the second injection the deceased became violently ill and grew steadily worse until about the 27th day of July, 1925, when he lost the power of speech and the use of both limbs and became partially paralyzed. That appellant was called to render necessary medical attention to relieve deceased's suffering, but that appellant, unmindful of his duty, refused to call upon and treat the deceased (at his home), whereupon deceased's relatives secured medical attention for deceased, and that by reason of which medical attention deceased was partially relieved from his pain and suffering, regained his power of speech, and to a large extent the use of his right hand and arm. However, from that time up to the date of deceased's death, he was paralyzed from his waist down, his bowels and kidneys ceased to function normally, one large ulcer developed on his back and another on his left hip, and that the injuries inflicted upon the deceased would not have been inflicted nor have caused his death had appellant used that degree

of care, skill, and knowledge required of him in the treatment of deceased, as alleged in said petition, that appellant should have used.

"That deceased was not suffering from the disease known as 'syphilis' and had never suffered from such disease, and that had the appellant, as it was then and there his duty to have done, before he administered such injection, made a Wasserman test, as a physician possessing that degree of knowledge, skill, and care, which physicians and surgeons practicing in San Antonio, Bexar county, Tex., ordinarily possess, would have done, appellant would then have ascertained that the deceased did not have such a disease, but notwithstanding said fact the appellant negligently treated said deceased for syphilis without first making such test and while deceased was not afflicted with said disease, which negligent treatment directly caused and contributed to said suffering and death of the deceased; that the administration of said injections for syphilis without first making a Wasserman test and the failure of appellant to thereafter wait upon and treat the deceased was negligence upon the part of appellant, and that such negligence directly caused and contributed to the injuries inflicted upon and suffered by the deceased and directly caused and contributed to his death. Wherefore appellees prayed for damages against appellant in the sum of $31,-000 for the widow of deceased, and $10,000 each for the children."

Appellant answered by special exceptions, general demurrer, general denial, and specially answered.

The case was tried before a jury on special issues, and the jury rendered a verdict finding appellant guilty of negligence in the administration of the injections, and further finding that such negligence directly caused or directly contributed to the cause of the death of deceased, and that appellant was negligent in failing to wait upon and treat deceased after said injections were administered, and that such negligence directly caused and directly contributed to cause the death of deceased, and that appellant did not exercise that degree of care, skill and ability that is ordinarily exercised by physicians and surgeons in this community, and that deceased's death was not caused by his diseased condition before, at the time, or after he became the patient of appellant, and that $31,000 if paid now would reasonably compensate appellees for the death of deceased, apportioned $20,000 to the widow and $5,500 each to the children.

Accordingly judgment was rendered for $31,000 on said verdict in favor of appellees against appellant by the court on October 4, 1926.

[1] The first assignment challenges as error the action of the court in overruling certain exceptions and makes no further mention thereof in any assignment of error until he gets to assignments 9, 13, 16, 22, 23, 24, 25, 26, 27, 28, 29, 30, which he indicates for error, so that we assume those not named

or urged are waived and we shall so treat them.

[2] The contention of appellees was that Patino was not suffering with the disease known as "syphilis," and had never so suffered, and that the treatment given by appellant was improper, and that it contributed to his death. Here the burden was on appellees to establish that fact.

The proof shows that the deceased sought appellant for treatment, and after an examination appellant reached the conclusion that deceased had the disease of syphilis and caused his assistant, Dr. S. L. Reveley, to take a sample of his blood for the purpose of making the Wasserman test. This was during his first visit to appellant when his wife was not present and did not see it taken.

She stated:

"I was not inside of the office with my husband when my husband went to see Dr. Urrutia the first time, I only went when he gave him the injections because he told me to be present. If a sample of his blood was taken on that first visit, I would not know anything about it."

Dr. S. L. Reveley, who specializes in pathology, swore that he took the blood test "either the 16th or the 17th of July, 1925." That he took it under "sterile precautions by sterilizing the needle." He swore:

"My test in this case showed a two plus positive Wasserman, that is what my test showed in the case of Edward Patino, that is the report that I have here. * * *

"I took this specimen myself. Dr. Urrutia was there at the time in the room. He held the tourniquet as I drew the blood. I did the wiping off and cleaning up and getting ready and the drawing of the blood."

The appellant did not, according to his direct testimony and that of his assistant, Dr. Reveley, undertake deceased's treatment for syphilis until he had the report of Dr. Reveley, who made the Wasserman blood test and an urinalysis showing a two plus positive Wasserman, meaning that his blood contained a substance that indicated that he had syphilis. While the appellant suspected he had that disease in his system, he did not treat him for that until the report of his assistant was made to him.

[3] No question is raised suggesting the want of knowledge, skill, and ability of these doctors. There is no evidence, circumstantial or otherwise, to overcome these positive statements, and their testimony is uncontradicted on the point appellee makes the charge, that the Wasserman test was not made, which is a ground of alleged negligence, and the testimony fails to support, in our judgment, that ground of negligence, but the contrary was proved, and the finding of the jury on that issue was not only against the preponderance of the evidence, but was against the evidence itself.

Appellant testified:

(297 S.W.)

"Mr. Patino came to see me the third time on the 23d of July, 1925. At that time I had received a report from Dr. Reveley some days before. On July 23d, after knowing the condition of the patient, I make my diagnosis perfectly clear. My diagnosis at this time was locomotor ataxia and nephritis, prior diseases of the same origin, chronic prior diseases produced by syphilis, and at the same time the locomotor ataxia is clearly confirmed by the examination of the blood. * * *

"And so I gave him one dose of this medicine, which I brought in my pocket—one of these ampoules. I cleaned the left arm with alcohol and tincture of iodine and I put the injection inside the vein very slowly. I am using this medicine constantly, but notwithstanding this I put the injection very slowly in the vein. I put the injection in. I tell him, 'I am using this because the kidneys are in bad condition, the worst I have ever seen. The report of Dr. Reveley shows you have Bright's disease, and it is necessary to use very small doses because you cannot eliminate medicine.' * * *

"I gave this man only one injection and that was an injection of ferro-arsen. That was the 23d of July. I never saw him any more after that.

"I use ferro-arsen frequently because I use it both before and after operations—before the operation to rebuild the system, to prepare them for the operation; and after in order to combat the anæmic condition of the patient. * * *

"If I had given him 90 c. c.'s of this ferro-arsen it would not have paralyzed him."

The main ground of alleged negligence is that in treating deceased for syphilis it was done without making the Wasserman test. That deceased was not afflicted with said disease, and such was negligent treatment which directly caused and contributed to the suffering and death of the deceased, and the further failure of appellant to wait upon and treat the deceased thereafter was negligence upon the part of appellant, which negligence directly caused and contributed to the injuries inflicted upon and suffered by the deceased and directly contributed to and caused his death.

Here we have several complaints in one. That he treated him for syphilis before having the Wasserman test made. That has been disposed of by the preponderance of testimony that appellant acted upon that test. The second complaint is that he failed to follow up and thereafter treat the deceased, which was a contributing cause of his death.

[4, 5] After appellant refused to follow up the case from his office, he was discharged and cannot be charged with neglect thereafter. In refusing to leave his office in accordance with his practice, his custom being only to treat patients who came to his office, he was within his rights and appellee was within her legal rights to secure another competent physician, which she did, though he did not consult with appellant. There is not the least evidence that if deceased had continued under the treatment of appellant he would have been cured. So, for negligent killing, the case must depend upon the fact that the improper treatment, if any, given by appellant, was the proximate cause of his death, and this is the pivotal point which must evolve the really true and only cause.

Of course, if negligently and carelessly administering without skill and ability the medicine was the direct cause of his death, appellant would be liable whether he treated him thereafter and followed it up or not. It would possibly be in that case a contributing cause, that he did not follow up and treat deceased, but the evidence to support such a doctrine should be very satisfactory. While it is probably true that the relation of the physician and patient is a very close one, and especially so is it with that of a family physician, the relation here was not of the latter class, but of the former.

Appellee testified that prior to the visit to appellant the deceased was suffering about eight days previous from indigestion right at the pit of the stomach, where he had pain. He worked regularly and had consulted with no doctor prior to going to see appellant. He consulted a dentist because he was suffering from his teeth. One time he had had a toothache and the tooth was pulled out and that was the only doctor who had treated him. He commenced complaining in the early part of June. He limped some since his childhood. The limp was caused by something wrong from childhood. Did not observe whether the limp was in the hip or in the foot.

Appellee testified:

"I informed Dr. Urrutia of his condition, but Dr. Urrutia did not come out to see him. He said he did not go to visit any one at their home. He did not send my husband any medicine and he never came to see him either, not even by paying him money.

"I then called Dr. T. N. Goodson to see my husband. Dr. Goodson came to see him instantly and he treated him. He gave him medicines. Those medicines had very little effect until about two days later. Then his mouth seemed to get better, it was not so paralyzed, but he never was able to walk again. His mother and I used to put him on his rolling chair, and then pick him up and put him back on the bed.

"Dr. Goodson treated him for about five months, he treated him until death.

"From the time that he went home on that Saturday, following the Thursday when he was given this double shot, he was never able to move again, and he lingered on and died."

Dr. Goodson, who took charge of the case, treated him for five or six months until he died. He stated:

"I made an examination of Edward M. Patino with reference to his glands and his vertebræ and I found them normal. There was no evidence of syphilis that I could find. * * *

"Being asked if I should inject neo-salvarsan into the veins of a perfectly strong normal

healthy man, whether it would hurt him, I will state that it may or may not; it could kill him, just by the arsenical poison. I have never had that happen in my experience. I have administered as many as 500 shots of neo-salvarsan and have never killed anybody yet. Being asked that if I should inject this into a man where his blood showed a positive Wasserman, whether it would necessarily kill him, I will state it would not make any difference whether he had it or did not have it. * * *

"He had sores. I could not say when they developed. They were what we call trophic ulcers, due to a nerve condition. I don't know when they developed; it was just in the course of the boy being sick. * * *

"When I was called to treat Edward M. Patino I gave him all the attention that was needed and required. I did the best I could. Being asked if the fact that Dr. Urrutia did not call on him hurt the patient any after I got him in charge, I will state that I would not want to appear egotistical."

Dr. B. F. Stout, a physician and clinical pathologist who limits his work to laboratory work bearing on medical diagnosis, which includes blood tests of spinal fluids, tested the fluid that Dr. Goodson took from the deceased's spine for syphilis and found it negative, which does not mean that he had no trace of syphilis.

Dr. Stout testified:

"The Wasserman test is the best test that you can make for syphilis. The Wasserman test on the spinal fluid is the most delicate test you can make. It is not considered more accurate than the blood test. The two together give more information than either one separately. You can take them both together. If one shows negative and the other positive, then you assume that it is syphilis.

"If a Wasserman test had been made of a person's blood on the 17th of the month and it showed positive, and then another test was made on the spinal fluid on the 29th of the month, being asked what would the last test in all probability have shown also, I will state that that would not have any bearing on what you found in the test on the blood, because they are two different tests."

[6] If we should believe under this evidence, or had the jury believed that ferro-arsen only was administered as appellant claims, then all the doctors testify that it is a tonic used to build up a sick person and nothing in it to cause paralysis, but was the proper treatment. It is not a medicine, but a tonic. The physicians all testify that neither ferro-arsen nor salvarsan in the quantities shown will produce paralysis of the lower extremities. It is true that some of the physicians in answering hypothetical questions stated that paralysis might result from an overdose, but none of them testified the injections given did that. It must not be forgotten that the burden to prove the case by the preponderance of the evidence is on the appellee.

The second ground for recovery alleged is in declining to visit the deceased on request to come and see him, who, it was alleged, was then greatly suffering and in a critical condition.

The testimony shows that appellant only did an office and hospital practice and did not visit at private homes. The deceased was not carried to the appellant's office or to any hospital, nor was it shown that he could not have been safely carried there for further examination and treatment. It is conceded that appellant declined to go to the private home for the reason he did not practice away from his office or hospital, presumably because his kind of practice held him where he had access to his equipment, etc.

[7, 8] Professional relations between the physician and his patient are at most merely contractual and may ordinarily be terminated at the will of either party. Miller v. Blackburn, 170 Ky. 263, 185 S. W. 864. The rule between them in this city seems to be that so long as that relation lasts it is the duty of the physician to treat him. It is said in Street on Personal Injuries in Texas, 782:

"* * * A physician is never justified in withdrawing from a case he has once undertaken at a critical stage when his place cannot be supplied. To withdraw means voluntarily to refuse to continue his services. If he is ever justified in so withdrawing when it is apparent that to do so must result in injury it can only be where the patient obstinately refuses to follow the treatment prescribed. It is a fact honorable to the profession that the question never seems to have been directly presented."

The contention of appellee is:

"First. That in failing to call upon and attend the deceased when he was called upon to do so that the appellant was guilty of a breach of his duty to his patient.

"Second. That in so refusing to call upon and attend his patient at a critical period the appellant improperly deprived his patient of his ability, his knowledge of his previous treatment, that appellant's actions deprived his patient of the services of a physician during several days of the most critical period of his illness so as to thereby directly cause and directly contribute to cause his death" (citing the following cases: Lee v. Moore (Tex. Civ. App.) 162 S. W. 437; Street on Personal Injuries in Texas, 782; Legal Medicine, Stewart, 255).

With the unsatisfactory testimony developed in this case, and owing further to the character of the illness of the deceased, who visited appellant for treatment at his hospital, who did not go outside to practice his profession and treat patients, we would not be justified nor can we afford to lay down a rule of law contended for concerning the ethics of the medical profession.

[9] Under the circumstances of this case, it cannot be said appellant was negligent in not going to see the deceased. When he was told of his ailments and sufferings he advised him over the phone what to take. The appel-

lee, being dissatisfied with appellant's refusal to make the visit, discharged him by immediately securing the services of a very competent and well qualified physician, who gave him prompt treatment for some six months before the patient died. It is not apparent that appellant's treatment would have been better than that of Dr. Goodson or would have saved his life.

· While it is true appellant was shown to be a physician of great skill and learning, perhaps not more so than Dr. Goodson, both physicians treated him with all their skill and ability.

The real question of law involved is as stated by this court in Hamilton v. Harris, 223 S. W. 537:

"Whether such reasonable care and skill was used as is ordinarily exercised by reputable physicians in the locality. The court says, in Graham v. Gautier, 21 Tex. 120:

" 'The duty and responsibility of a physician is well stated by a judge in Pennsylvania: "It is a rule of law that a medical practitioner never insures the result, but simply engages that he possesses a reasonable degree of skill, such as is ordinarily possessed by a profession generally, and to exercise that skill with reasonable care and diligence, and, again, to exercise his best judgment, but is not responsible for a mistake of judgment." That is, after he has, with reasonable care and diligence, exercised ordinary skill, he is not responsible for a mistake of judgment, or for the result if he should happen to be mistaken. Such are the rules applicable to the ordinary, implied undertaking of a physician. They may be varied by special circumstances or agreements.'

"This opinion is by the 'old Alcalde,' whose opinions always carry great weight.

"Coombs v. King, 107 Me. 376, 78 A. 468, Ann. Cas. 1912C, 1121, reported in 3 Negligence and Compensation Cases Ann. p. 171:

" 'The physician is not an insurer. He does not warrant favorable results. If he possesses ordinary skill, uses ordinary care, and applies his best judgment, he is not liable even for mistakes in judgment. Medical science is not yet, and probably never can be, in many respects, an exact, certain science. The practitioner cannot be expected to know, or be bound to diagnose correctly, that which is unknowable, as many of our hidden ailments may be.' Shockley v. Tucker, 127 Iowa, 456, 103 N. W. 360; Sweeney v. Erving, 228 U. S. 233–243, 33 S. Ct. 416, 57 L. Ed. 818, Ann. Cas. 1914D, 905.

"The physician is not expected to look for unexpected results from treatment of his patients, but is compelled to look for natural and probable results He is not expected to anticipate results arising from peculiar characteristics and conditions of a patient, nor is he an insurer of unexpected results."

Justice Taft, when on the circuit bench in the case of Ewing v. Goode, 78 F. 442, held:

"Before the plaintiff can recover, she must show by affirmative evidence; first that defendant was unskillful or negligent; and second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsesquently the eye was in such a bad condition that it had to be extracted, established neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

The above quotation is found in the case of Miller v. Blackburn, 170 Ky. 270, 185 S. W. 867, cited supra.

[10] Too much emphasis was placed by the appellee and by the court's charge and the argument of counsel before the jury upon the fact that appellant did not visit deceased at his home. Such being the state of the record, appellant timely asked the court to submit the charge:

"In determining your answer to question No. 3, you are instructed, if you believe from the evidence that the defendant as a physician did not make visits to patients outside of his office or hospital, and if you further believe from the evidence that this fact was communicated to the family of Edward Patino and that, after the defendant refused to visit Edward Patino, the family of Edward Patino secured the services of another physician, to wit, Dr. Goodson, and if you further believe from the evidence that Dr. Goodson rendered to Patino all the services, skill, and ability that could or would have been rendered by the defendant, then you are instructed to answer this question No. 3, 'No.' "

Several other charges of a similar nature were requested and refused by the court, which was error to refuse.

It has not been shown that appellee could not have carried the deceased to the hospital for appellant to see him and further advise and consult with him, or that appellant was advised (if that would make any difference as a matter of law) that his condition was such that he could not be moved in an ambulance or other vehicle to see the doctor. Immediately after the communication appellee secured the services of Dr. Goodson, another physician, no doubt as learned and skilled in his profession as appellant, and who was advised of the treatment by appellant for the disease of syphilis.

As this case is to be retried, we will not enter into a further discussion of the testimony.

There are other errors assigned, as committed during the progress of the trial, some of which are well taken, but will not be further noticed here as they will probably not be committed on another trial. We will not pass on the assignment raised as to the effect

that the argument of counsel may have had in improperly influencing the verdict. However, we take occasion to admonish counsel generally against making remarks that tend to arouse prejudice in the minds of the jurors.

For the reasons stated and those apparent of record, we think the court erred in not granting a new trial, so the judgment is reversed and the cause remanded.