Robert **GROSS, M.D., All Saints Integrated Affiliates d/b/a All Saints Medical Associates, and Stephanie Perdue, M.D., Appellants,**

v.

**Alyssha and Keith BURT, Individually and as Next Friends for Hunter and Tyler Burt, Minor Children, Appellees.**

No. 2–01–206–CV.

Court of Appeals of Texas, Fort Worth.

Sept. 2, 2004.

Rehearing Overruled Sept. 30, 2004.

214

Haynes and Boone, L.L.P.; E. Earl Har-
crow, Craig M. Price, and Karen Williams

Altaras, Fort Worth, for appellant Robert Gross, M.D.

Cooper & Scully, P.C.; R. Brent Cooper and Diana L. Faust, Dallas, for appellant All Saints Integrated Affiliates d/b/a All Saints Medical Associates and Stephanie Perdue, M.D.

Jose, Henry, Brantley & Keltner, L.L.P.; Rickey J. Brantley, David E. Keltner, and Anna K. Alvarado, Fort Worth, for appellees.

PANEL A: LIVINGSTON and WALKER, JJ.; SAM J. DAY, J. (Retired, Sitting by Assignment).

## OPINION ON REHEARING

TERRIE LIVINGSTON, Justice.

After reconsidering our prior opinion on appellees' motions for rehearing and motions for rehearing en banc, we deny the motions for rehearing and rehearing en banc,[1] withdraw our February 26, 2004 opinion and judgment, and substitute the following in their place.

A jury found several defendants negligent in this medical malpractice case regarding their failure to treat and diagnose twin premature infants for retinopathy of prematurity, which resulted in permanent injury and partial blindness for the twins. The appellees, Alyssha and Keith Burt, asserted claims in their individual capacities and on behalf of their two sons, Hunter and Tyler. They asserted claims against Robert Gross, M.D., a pediatric ophthalmologist, Stephanie Perdue, M.D. and Wayne Yee, M.D., both pediatricians, All Saints Integrated Affiliates d/b/a/ All Saints Medical Associates (All Saints), Dr. Perdue's employer, and Harris Methodist Texas Health Plan, Inc. d/b/a Harris Meth-odist Star Health Plan (the Plan). Prior to trial, the trial court granted Dr. Gross's motion for summary judgment as to the Burts' claims with respect to Tyler based upon the lack of a physician-patient relationship. The Burts' remaining claims proceeded to trial. The jury returned a verdict against all of the defendants except the Plan. The Burts settled with Dr. Yee. Dr. Gross, Dr. Purdue, and All Saints appealed. This appeal follows. We reverse the trial court's judgment and render judgment against the Burts on all of their claims against Dr. Gross, Dr. Perdue, and All Saints.

### Factual Summary

Hunter and Tyler were born prematurely on December 26, 1996 at Harris Methodist Hospital (Harris). They both required ventilation and some oxygenation and remained in Harris's neonatal intensive care unit (NICU) until February 1997. At birth, Tyler weighed three pounds one ounce and Hunter weighed two pounds nine ounces. They both required intravenous feeding and were diagnosed with apnea of prematurity, bradycardia of prematurity, and neonatal jaundice. Hunter also had an inguinal hernia. Further, because of his weight and prematurity, Hunter was potentially at risk for retinopathy of prematurity (ROP), which can result in retinal scarring, retinal detachment, vision loss, and even blindness. Babies at risk of ROP require serial screening.

In the NICU, Tyler was identified as Twin A and Hunter as Twin B. Medical records reflected their mother was Alyssha Taylor and their father was Keith Burt. Both twins were given the last name of Taylor at Harris.[2]

---

1. See separate orders of same date as opinion attached.

2. Alyssha and Keith were not married at the time of the twins' birth. Before they married, Alyssha used her last name, Wilson, or her

Dr. Kim Smith, a neonatologist, was the admitting and attending physician for the twins while they remained in the NICU. The attending neonatologist determines whether a premature baby needs to be screened for ROP. Harris's Level III NICU has an ROP screening protocol, and when a premature infant meets the protocol's criteria, that infant's name is placed on one of the consulting ophthalmologists' examining lists. The actual screening is performed by a pediatric ophthalmologist. At the Harris NICU, the pediatric ophthalmologist is a consulting physician requested or ordered by the attending physician, who reports back to the attending physician. Thus, Dr. Smith ordered a screening ROP examination for Hunter because he met hospital protocol for screening due to his birth weight and gestational age of twenty-nine months. Tyler did not fall within the NICU's parameters, so Dr. Smith did not order an initial ROP screening test on him. On Dr. Smith's order, Dr. Gross, who was a consulting pediatric ophthalmologist for the NICU, performed a preliminary screening examination on Hunter on February 8, 1997. Hunter was identified by Dr. Smith as Twin B at the time Dr. Gross performed the screening tests.

Dr. Gross determined that Hunter had Stage I ROP in his right eye. He forwarded an ROP "Initial Evaluation" report of his findings and recommendations back to Dr. Smith and recommended that Hunter seek a follow-up visit within two weeks. Prior to Hunter's evaluation in the NICU, the Harris NICU nurses helped Alyssha make eye appointments for both twins at Dr. Gross's office for February 17, after their discharge. Alyssha used the names Hunter and Tyler Burt when she made the February 17, 1997 appointments.

Tyler, Twin A, was discharged from the NICU on February 5, 1997, and Hunter, Twin B, was discharged on February 13, 1997, before their scheduled February 17 appointments with Dr. Gross. Dr. Smith testified that the parents had been sufficiently educated about ROP by the time of the babies' discharges. Jerri Ballard, a Harris NICU nurse, testified that in her opinion both of the parents were taught the importance and relevance of the follow-up ROP appointments in order to be discharged from the NICU.

Upon discharge, Alyssha selected Dr. Wayne Yee, a pediatrician, to become the babies' primary care physician. Dr. Yee examined Tyler on February 12, 1997, and his external eye exam was normal. He confirmed Alyssha's appointments for both twins with Dr. Gross for the 17th. Dr. Yee testified that he discussed with the Burts the importance of making the appointments for the ROP exams.[3] A doctor-to-doctor letter from Dr. Smith to Dr. Yee specifically identified Hunter's ROP diagnosis and showed that both twins had set up appointments with Dr. Gross for February 17. Hunter's appointment with Dr. Gross was "starred," as was his ROP diagnosis.

The NICU also confirmed the twins' appointments with Dr. Gross for February 17, 1997. Alyssha and Keith were informed of the importance of the follow-up appointments for ROP. However, Alyssha did not take the twins to this appointment because she had no referral. Records at Dr. Yee's office show that Alyssha requested a referral from Dr. Yee to Dr. Gross on

previous married name, Taylor. She used Taylor as the last name for the twins in the NICU, but made all appointments with Dr. Gross using the name Burt.

3. Although she had no previous experience with premature babies, Alyssha had worked as a nurse's aide before giving birth to the twins.

February 17, the actual day of their appointment. Dr. Yee completed the referral on February 19.

Alyssha rescheduled the appointment for February 28, 1997; however, they missed this appointment too. In the interim, both twins had been admitted to Cook Children's Hospital (Cook's) on February 24 due to a virus. Hunter was released from Cook's on February 28 and Tyler was released on March 1. Alyssha never called to cancel the February 28 appointment or to reschedule it. Dr. Yee testified that he had instructed Alyssha to postpone the February 28 appointment since one or both twins were about to get out of the hospital.

As of March 1, Alyssha and Keith had become dissatisfied with Dr. Yee. At the same time, Alyssha knew they had missed two appointments with Dr. Gross. On or about March 6, 1997, the parents terminated Dr. Yee's services and switched to Dr. Stephanie Perdue as their new pediatrician. Except for Hunter's February 8 examination by Dr. Gross, Hunter and Tyler did not see a pediatric ophthalmologist until June 1997 when they were diagnosed as being legally blind.

After trial but before the jury's verdict came in, Dr. Yee settled with the Burts for $7.5 million. The jury found all three doctors negligent, as well as All Saints. They found Dr. Yee liable for 50% and 60% of the damages to Hunter and Tyler, respectively; Dr. Perdue liable for 30% and 35%, respectively; Dr. Gross liable for 15% of Hunter's damages; and the parents liable for 5% of the twins' damages. The jury awarded no punitive damages against any defendant and found that the Plan was not liable at all. Pursuant to the settle-

ment, the Burts dismissed their claims against Dr. Yee. The trial court entered a judgment against Dr. Gross, Dr. Perdue, and All Saints accordingly.

## Issues Relative to Dr. Gross's Appeal

In five issues, Dr. Gross challenges the judgment rendered against him. In his first issue, he challenges the legal and factual sufficiency of the evidence to support the jury's finding that his negligence caused any harm to Hunter. In his second issue, Dr. Gross challenges the trial court's rulings on several evidentiary issues including: the trial court's refusal to allow Dr. Gross to introduce evidence of nystagmus as an alternate theory of causation; the trial court's refusal to strike Dr. Don Schaffer's testimony that Dr. Gross was negligent; and the trial court's prohibiting Dr. Gross from offering an explanation of Hunter's name change from Taylor to Burt. In his third issue, Dr. Gross contends Alyssha and Keith cannot recover mental anguish damages because such alleged damages were not a contemporaneous result of Hunter's injuries. In his fourth issue, Dr. Gross challenges the legal and factual sufficiency of the evidence to support the various amounts the jury awarded Hunter. In his fifth issue, Dr. Gross challenges the Burts' right to an award of prejudgment interest on future damages.[4]

### Facts Relative to Dr. Gross

When Hunter was added to Dr. Gross's screening list at the NICU, Dr. Gross performed an initial examination. The only information or record Dr. Gross maintained on Hunter was the one-page examination sheet he completed and the

---

4. In the Burts' letter brief and at oral argument they concede that the Texas Supreme Court opinion, *Columbia Hospital Corp. v. Moore,* prohibits the award of prejudgment interest on future damages in health care liability claims. 92 S.W.3d 470, 474–75 (Tex. 2002). Thus, we sustain Dr. Gross's fifth issue.

registration information the hospital had provided him. While it showed the parents' names as Alyssha Taylor and Keith Burt, the twins' last name was shown as Taylor. Dr. Gross did not know that Alyssha and Keith had changed the twins' last name to Burt until after they had instigated litigation.

Before beginning his examination of Hunter at the NICU, Dr. Gross reviewed Hunter's NICU chart to look for any other infections or systemic issues that might potentially affect the child's eyes. He verified the charted problems and that the name on the chart matched the name on the bassinet and the patient. He also checked the date of birth, birth weight, and gestational age at birth, and whether it was a multiple birth. When Dr. Gross saw Hunter on February 8, the NICU nurses had charted his gestational age as 30 weeks. Dr. Gross noted his birth weight of 1170 grams.

When he completed Hunter's exam, he prepared an initial ROP report that showed his findings indicating stage I ROP in Hunter's right eye. This report showed Hunter's date of birth, gestational age, and birth weight and recommended a follow-up visit in two weeks. The report was made on a Harris form listing Alyssha Taylor and Douglas Burt [5] as parents. It was charted with the name "Hunter Taylor 'B' " and dated February 8, the day of the exam.

Dr. Gross testified that it was very common for him to see only one of a group of twins or triplets. He also testified that he knew at trial that the hospital had scheduled both twins' appointments with him for February 17, but that he did not know it at the time. At Alyssha's request, his office rescheduled appointments for February

28. The twins missed that set of appointments too because they had been admitted to Cook's on February 24 and had both been discharged by March 1, 1997, but no one advised Dr. Gross or his office of this or requested that he see either of them at Cook's instead. Dr. Gross never examined Tyler and Hunter after the February 8 in-hospital exam of Hunter.

Sometime later in February, Dr. Gross's office received the twins' referrals from Dr. Yee, which indicated a tentative diagnosis of ROP. When asked why his office did not track them down, Dr. Gross said that any patient who made appointments and rescheduled, but did not call to cancel the second appointment, was not tracked down by his office. He said it was unethical to run down patients who were "no shows" or indicated they did not desire to be treated at his office by virtue of their cancellations. According to Dr. Gross, if an existing patient missed an appointment, the patient received a notice from his office, but the office does not send out notices to new patients. Only if the referring doctor had sent the new patient to Dr. Gross with a request for results would he have notified the referring doctor that his or her patient had not showed.

**Discussion of Dr. Gross's First Issue**

Dr. Gross challenges the jury's finding that his negligence contributed to Hunter's injuries. This issue is based on Dr. Gross's assertions that 1) his limited physician-patient relationship with Hunter terminated upon completion of the initial screening for ROP; 2) he never established a physician-patient relationship with anyone named Hunter "Burt"; 3) he never acted negligently toward Hunter; and 4)

---

5. There is no explanation in the record as to why Keith Burt is referred to as Douglas Burt on this form.

no conduct of his proximately caused any injury to Hunter, Alyssha, or Keith, according to proper standards of reasonable medical probability.

## Legal and Factual Sufficiency Standards of Review

In determining a "no-evidence" issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez,* 937 S.W.2d at 450; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262 (Tex.2002).

A "no-evidence" issue may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 362–63 (1960)), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999).

When we sustain a "no-evidence" issue, it is our duty to render judgment for the appellant because that is the judgment the trial court should have rendered. *See* Tex. R.App. P. 43.3; *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex.1986) (quoting *Nat'l Life & Accident Ins. Co. v. Blagg,* 438 S.W.2d 905, 909 (Tex.1969)).

An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

Absent an objection to the jury charge, the sufficiency of the evidence is reviewed in light of the charge submitted. *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 715 (Tex.2001); *see also City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 68–69 (Tex.2000).

## Physician–Patient Relationship

A cause of action based on medical negligence requires a showing of a duty to conform to a particular standard of care, a breach of that standard, a resultant injury, and a causal connection between the breach of the standard and the injury. *Majzoub v. Appling,* 95 S.W.3d 432, 436 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (op. on reh'g). Duty in a medical malpractice case is triggered by the existence of a physician-patient relationship. *St. John v. Pope,* 901 S.W.2d 420, 423 (Tex.1995). "The question of duty is a question of law, which a court must decide before reaching the standard of care." *Majzoub,* 95 S.W.3d at 436. The *Majzoub* court further held, "If there is no prior relationship between the physician and the patient, there must be some affirmative

action on the part of the physician to treat the patient to create such a relationship." *Id.* A physician will not be liable for malpractice unless the breach of some duty arises from a physician-patient relationship. *Id.*

■ Historically, Texas courts have required an agreement between the physician and patient or some affirmative act on the part of the physician before a legal duty arises. *Wax v. Johnson*, 42 S.W.3d 168, 172–73 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). But that relationship may be established with the express or implied consent of the physician. *Majzoub*, 95 S.W.3d at 436. "A contract implied in fact 'arises from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract.' " *Lection v. Dyll*, 65 S.W.3d 696, 704 (Tex. App.-Dallas 2001, pet. denied).

■ In *St. John*, our supreme court held, "Creation of the physician-patient relationship does not require the formalities of a contract. The fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship." *St. John*, 901 S.W.2d at 424. But, the "on-call" status of a physician does not, without more, establish a duty. *Id.* "Once such a relationship exists, however, the physician then owes the patient a duty to treat him or her with the skills of a trained, competent professional, and a breach of that duty may give rise to a malpractice action." *Reynosa v. Huff*, 21 S.W.3d 510, 513 (Tex. App.-San Antonio 2000, no pet.). It is the patient's burden to prove the existence of the physician-patient relationship and the resulting existence of a duty. *Rampel v. Wascher*, 845 S.W.2d 918, 921 (Tex.App.-San Antonio 1992, writ denied).

In this case, Dr. Gross contends that he had no physician-patient relationship with a Hunter "Burt" and that any relationship he had with Hunter "Taylor" ended when he completed the initial screening ROP exam on February 8, 1997 in the NICU and provided Hunter's attending neonatologist with his report and diagnosis. We must determine whether that relationship terminated once Dr. Gross reported his findings to the twins' NICU physician or whether it continued. Likewise, we must also decide whether the "Dear Parent" letter described below, the Plan, or the scheduled-but-missed appointments created a continuing physician-patient relationship between Dr. Gross and Hunter.

**Preservation of Error**

The dissent contends that the physician-patient relationship issue was not submitted to the jury because the parties agreed that the court had determined as a matter of law that there was a physician-patient relationship between Dr. Gross and Hunter. Dissenting Op. at 242–43. We believe this is a mistaken interpretation of the charge conference. The Burts, not Dr. Gross, asked to submit a question as to whether Dr. Gross had a physician-patient relationship with Hunter in response to Dr. Gross's objection to the submission of the negligence question against him.[6] As we have noted above, it is the plaintiff's burden to show the existence of the physician-patient relationship before a duty exits. *Rampel*, 845 S.W.2d at 921. Thus, the Burts should have required the very issue the dissent says we should infer against Dr. Gross. The court said it best, "Well, to meet the objection [Dr. Gross's objection to the submission of his negligence because of no-evidence-of-duty by Dr. Gross as to the "care and treatment

---

**6.** Dr. Gross contended there was no evidence

he owed any duty to Hunter.

... in the office"], you [the Burts] would have to include the issue, correct? .... To take the objection out of the case, you [the Burts] would have to submit the issue and get a positive finding."[7] Dr. Gross's counsel stated that he was not waiving any issue relative to denial of the physician-patient relationship on an evidentiary level, i.e., no evidence of negligence or proximate cause because of no physician-patient relationship.[8] His statement that the court had already determined there *was* a physician-patient relationship as a matter of law must be based on the court's prior denial of Dr. Gross's motion for summary judgment as to Hunter; in that respect the trial court had decided that there was some evidence that could support a jury finding of a physician-patient relationship at some point in time.

■ Dr. Gross's post-judgment motions continued to challenge the existence of the relationship after Dr. Gross provided his report to Dr. Smith. In Dr. Gross's motion for judgment NOV he again asserted no evidence of (a) a physician-patient relationship with Hunter, (b) negligence, and (c) proximate cause. Likewise, in his motion for new trial he continued to assert his no-evidence challenges. Thus, we conclude that Dr. Gross never conceded this issue.

Additionally, the dissent contends we cannot determine whether the physician-patient relationship terminated upon Dr. Gross's completion of Hunter's exam and reporting of his findings to the neonatologist because Dr. Gross failed to submit or request a jury question or instruction on termination of the relationship. Dissenting Op. at 243. The dissent bases its contention on rule 279. TEX.R. CIV. P. 279.

We disagree with this application of the rule for two reasons. First, it was the Burts' burden to prove the existence of a physician-patient relationship and the resulting duty. Second, rule 279 clearly states that a party may assert a legal or factual insufficiency challenge for the first time, post-verdict. *Id.* Thus, we believe that although the jury's verdict and resulting judgment may and do infer a finding of a physician-patient relationship between Dr. Gross and Hunter, Dr. Gross's failure to ask for such a question or instruction does not waive his right to challenge that inferred finding on appeal.

### The "Dear Parent" Letter

While Dr. Gross contends he had discharged his duty to Hunter by examining him in the NICU and reporting the results of the examination to Dr. Smith, the Burts contend that the physician-patient relationship continued and Dr. Gross consented to further examination and treatment of Hunter, especially in light of a letter from Dr. Smith's office that was either taped to Hunter's crib in the NICU before the first exam or included with his discharge papers. In pertinent part, that letter, on Fort Worth Neonatal Associates, P.A. letterhead, said:

Dear Parent:

An eye examination has been scheduled for your baby this week in order to check for the presence of a condition known as Retinopathy of Prematurity (ROP); an inflammation of the retina—the coating of the inside of the eye that provides our vision. The frequency and severity of ROP is primarily related to birth weight and prematurity, with babies born very early and with the lowest

---

7. There was no need to submit an issue as to Tyler because Dr. Gross had already been granted a summary judgment in his favor as to Tyler.

8. The Burts' counsel responded that he would not ask Dr. Gross to waive that point.

birth weights having the highest risk of experiencing ROP.... ROP may advance to the point where scarring may occur which may disrupt the vision....

.... Depending on the gestational age of your baby and the findings at the time of the eye examination, follow-up visits may be required.... These follow-up examinations are routine and are necessary due to the fact that ROP may present at any time until the retina is mature. You will be contacted by your baby's pediatric ophthalmologist if any significant findings are detected which would in any way affect your baby's health or vision. In specific circumstances, your pediatric ophthalmologist may request another ophthalmologist consultant to also check your baby's eyes. Robert D. Gross, M.D., is the Pediatric Ophthalmologist who staffs our NICU.

.... If you have any questions, please feel free to ask your nurse or your baby's doctor.

The Burts contend that the "Dear Parent" letter, coupled with other evidence, shows that there was a continuing physician-patient relationship between Hunter and Dr. Gross and that Dr. Gross showed his consent to undertake further testing. Dr. Smith, Hunter's neonatologist, testified that, as the primary care physician while Hunter was in the NICU, it was his duty to communicate the ROP results to Hunter's parents, and that once he had received Dr. Gross's findings, Dr. Gross's relationship with Hunter ended. Likewise, Dr. Miles Burke, the Burts' expert, admitted that the primary care physician should communicate the ROP results to parents. Also, he agreed that once the twins left the hospital, "the primary care physician carries the baton to be the leader." Dr. Burke's deposition testimony and his trial testimony were inconsistent on whether the appropriate standard of care required Dr. Gross to also directly communicate his findings to Hunter's parents. In his deposition testimony, Dr. Burke said he had no criticism of Dr. Gross for not meeting with the parents and communicating the results of his examination of Hunter. At trial, he testified it was Dr. Gross's responsibility "to make sure that the follow-up exams [were] carried out" and that he should have identified Hunter Burt as Hunter Taylor. He said he changed his opinion after seeing the "Dear Parent" letter.

The evidence showed that the "Dear Parent" form letter was written by Fort Worth Neonatal Associates, P.A., *Dr. Smith's practice group*, as opposed to Dr. Gross's group. The fact that Dr. Gross might have approved the form of the letter should not alone constitute a continuing relationship by someone other than the writer of the letter. "[T]he duty to treat [a] patient ... [properly] ... flows from the consensual relationship between the patient and physician." *St. John*, 901 S.W.2d at 423. This duty cannot be created unilaterally by a third-party in favor of some unknown patient. The letter itself does not identify the patient or the parents to whom it is written, is on Fort Worth Neonatal Associates, P.A. letterhead, and is signed by that group, not by Dr. Gross. To impose a duty on a physician based upon a third-party's letter to an unidentified patient or parent would interfere with that physician's ability to decline to treat the unknown patient. *See, e.g., id.* The physician-patient relationship is "wholly voluntary." *Fought v. Solce*, 821 S.W.2d 218, 220 (Tex.App.-Houston [1st Dist.] 1991, writ denied). And while consent may be implied, it cannot be based upon this type of form letter alone.

Further, Alyssha testified that she had never even seen the "Dear Parent" letter. Thus, we cannot conclude that she or

Keith relied on any part of the letter as implying a continuing relationship with Dr. Gross. We, therefore, hold that the "Dear Parent" letter did not impose a duty of continued care on Dr. Gross.

**The Plan**

██ The Burts also point to Dr. Gross's contract with the Plan, of which they were members. That contract, which was introduced into evidence, states that Dr. Gross agrees to accept as patients all Plan members referred by a referring primary care physician participating in the Plan. Even if we assume the Plan constituted evidence of Dr. Gross's willingness or obligation to treat Hunter, Hunter's parents never actually took Hunter to see Dr. Gross. While Dr. Gross testified that he was willing to test and treat Hunter at his office, for that to occur Hunter must first have been taken to that office. This is true regardless of Dr. Gross's contract with the Plan. That agreement required the physician not to *refuse treatment* when and if requested by a member patient and referred by another plan member. No one ever took Hunter to Dr. Gross's office, so he never could have refused to treat Hunter.

We can compare these facts to those of *Day v. Harkins & Munoz*, 961 S.W.2d 278 (Tex.App.-Houston [1st Dist.] 1997, no writ).[9] There, two doctors agreed to provide emergency and first aid care to patrons at an arena during a rock concert. *Id.* at 279. A patron, Day, suffered an asthma attack after the concert and later died. *Id.* Because the concert had ended, the doctors had already left and therefore never treated Day. *Id.* The court was faced with determining whether the doctors' contract with the arena gave rise to a duty to treat Day that would have supported his

medical malpractice claim. *Id.* at 280. Because the agreement was only between the doctors and the arena, the court concluded there was no contract between Day, the patron, and the doctors. *Id.* at 281. The court held that, based on the doctors' affidavits, once the concert ended or the doctors left the premises, their duty to provide treatment had ended; therefore, there was no physician-patient relationship between Day and the doctors as a matter of law. *Id.*

Similarly, Dr. Gross's examination of Hunter in the NICU was based upon his agreement with the Plan and his obligations to the hospital and the neonatologist physicians. When Dr. Smith ordered the ROP screening exam, Dr. Gross was required to undertake the exam and report the results back due to his contract with the patients' managed care plan. But, like the two arena doctors, once Dr. Gross completed and reported the test results to Dr. Smith, his relationship with Hunter ended. Thus, under this set of facts there can be no continued duty owed to Hunter based on the terms of the Plan.

**Scheduled–But–Missed Appointments/Name Change**

The undisputed facts show that Alyssha knew Hunter and Tyler had appointments with Dr. Gross for something wrong with their eyes because she, in fact, made their appointments, before they were first discharged. The appointments were also reviewed and discussed in preparation for the twins' discharge, and she understood they would not even be discharged without the appointments. Likewise, Alyssha rescheduled their first missed appointments, but then failed to show up or call regarding the rescheduled appointments. She

9. The discussion of the medical malpractice issue in *Day* was determinative of the main issue in that case: whether the Days' attorneys committed legal malpractice in the underlying medical malpractice case. 961 S.W.2d at 280–81.

went by Dr. Yee's office on February 18 to pick up a referral for the children's other surgical procedures planned for February 19, but did not even inquire about the referral to Dr. Gross that she had also requested the day before. Both she and Keith testified that they knew something was wrong with the twins' eyes, but did not know what it was or thought it was just from a cold. However, on cross-examination, Alyssha also testified that she knew they needed to be seen by a pediatric ophthalmologist. When asked "why," she said, "[B]ecause they were premature, and that's the only reason I understood. That's the only thing I understood, was premature infants had to go."

Thus, after missing the first two appointments, the Burts never followed through with obtaining eye appointments with Dr. Gross and instead ultimately went to another pediatric ophthalmologist, Dr. Antinone. This is yet further evidence that neither Alyssha nor the children's subsequent pediatrician thought they were required to see *only* Dr. Gross or that they had a binding relationship with him that required him to track them down regarding their missed appointments.

The dissent focuses on Dr. Gross's office's failure to call or write the Burts regarding the patients' two missed appointments as is the office policy. Dissenting Op. at 246. As to the first appointment, the doctor's office did call; they called the Friday before the February 17 appointment as a reminder of the appointments and their need for a referral. Alyssha went to Dr. Yee's office the morning of February 17 to pick up the referral for the appointment with Dr. Gross that afternoon. However, Dr. Yee's office informed her that they were unable to obtain a referral on that short notice, so the appointment was rescheduled to February 28. Therefore, there was no need for Dr.

Gross's office to call Alyssha regarding the February 17 appointment.

Regarding the February 28 appointment, the twins were "no shows"; their mother did not call the office to cancel beforehand or afterward to reschedule. The dissent says that Dr. Gross was negligent regarding this appointment because his office failed to follow-up by postcard or phone call as the office policy requires. However, the policy applies to *existing* patients. Hunter was a completely new patient under the new name, "Burt." Moreover, Alyssha did not tell the office of Hunter's name change or that Hunter had been seen before. And although the initial ROP form disclosed Hunter's father's name as "Burt," there was no evidence showing that Hunter's files would be under that name instead of "Taylor." Since the office did not know Hunter was an *existing* patient, he did not get a reminder.

We can contrast these facts to those in *Hand v. Tavera,* 864 S.W.2d 678 (Tex. App.-San Antonio 1993, no writ). There, as here, the physician had an agreement with the patient's health care plan to provide medical care to the plan's patients. *Id.* at 679. This relationship, coupled with the patient's participation in the plan, was enough to impose a duty on the physician when the patient sought care. The court held: "[W]hen the health-care plan's insured *shows up* at a participating hospital emergency room, and the plan's doctor on call is consulted about treatment or admission, there is a physician-patient relationship between the doctor and the insured." *Id.* at 679 (emphasis added). The doctor's liability was based on his contract with the plan and the fact that the patient "*showed up*" at the emergency room. *Id.* Here, unfortunately for Hunter, he never showed up.

Further complicating this issue, the evidence mentioned above showed that Alys-

sha made the appointments for the twins under their new last name, "Burt." Dr. Gross's computer printout of appointments shows the twins as "Burt-new patients" whereas the hospital's records of the NICU, and therefore Dr. Gross's office records, were under the name, "Taylor." Alyssha never advised Dr. Gross's office of the name change and never told them that Hunter, at least, had been seen at the NICU by Dr. Gross under a different name. While Dr. Burke opined that Dr. Gross should have connected the two names, he provided no basis for that conclusion. *See* Tex.R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556–57 (Tex.1995).

The dissent concludes that all these factors, coupled with Hunter's initial screening ROP exam in the NICU show Dr. Gross's intent to provide Hunter's course of treatment, not just the initial exam. Dissenting Op. at 249–50. Further, the dissent believes Dr. Gross's failure to follow-up the missed appointments coupled with the "Dear Parent" letter are enough to establish the continued relationship even if it might not have been enough to establish a new relationship. Dissenting Op. at 249–50. We believe, however, that none of these facts, either individually or combined, are evidence of the actual continuation of the physician-patient relationship. This is so, especially in light of the absence of evidence that anyone told Dr. Gross's office that the child's name had been changed, thereby leaving Hunter "Burt" classified as a new patient. Because the only evidence at trial is that Hunter's parents did not keep, but further rescheduled missed appointments, without at some point showing up for the appointments, there is no evidence indicating the patient's acceptance of continued care by Dr. Gross.

## Conclusion on Dr. Gross

While a previous physician-patient relationship is a factor to consider in determining whether the relationship and resulting duty continue, it is not alone enough to support the existence of the relationship. Likewise, Dr. Gross's contract with the Burts' managed care group that might have prevented him from declining the twins as patients at both the hospital and his office is not enough to support the existence of a continuing relationship; the patient must at least "show up" to seek the medical care. "[T]he mere act of ... agreeing to see the patient at a later time [does] not establish the physician-patient relationship." *Jackson v. Isaac*, 76 S.W.3d 177, 182 (Tex.App.-Eastland 2002, pet. denied) (citing *Irvin v. Smith*, 272 Kan. 112, 31 P.3d 934, 941 (2001)). This should be especially so when an intervening identification issue has arisen, as in this case.

If we were to expand the duty of continued care to all patients who are seen at hospitals by consulting physicians beyond the hospital setting based solely upon the fact that they were seen by the physician in the hospital, there would be no end to the physician-patient relationship. Thus, all specialists or on-call physicians could be bound to an endless duty of continued care even if they had completed their assigned duty at the hospital and the patient failed to follow through. This is not to say that the ophthalmologist on staff or on call at a hospital does not owe a duty to correctly diagnose and/or treat a patient while at the hospital, but only that it is not enough to create a continuing duty. Where, as here, the specialist is requested to perform an initial screening and report the findings back to the NICU physician,

who continues the control over the patient's care, we cannot impose a post-hospital never-ending duty. For these reasons, we hold, under the facts, that the examination of a patient at a hospital by a consulting or referred specialist physician does not create a continuing duty upon that physician to insure follow-up is maintained once the physician has supplied the primary or referring physician with the results unless the patient and the consulting or referred specialist physician take some further affirmative action to continue the relationship. While additional or different facts could arise that would change the result, we likewise hold that scheduled-but-missed appointments are insufficient to continue or create a duty, even when combined with third-party letters such as the "Dear Parent" letter. The "Dear Parent" letter, along with Dr. Burke's opinion that it created a duty on Dr. Gross's part to insure follow-up visits, is less than a scintilla of evidence to uphold the jury's verdict on a vital fact—a continued physician-patient relationship. Without a physician-patient relationship, there can be no duty. *See St. John,* 901 S.W.2d at 423. Therefore, we sustain Dr. Gross's first issue.[10]

## Issues Presented Relative to All Saints and Dr. Perdue

In five issues, All Saints and Dr. Perdue contend that (a) the trial court erroneously calculated and awarded damages in the final judgment, (b) the Burts are not entitled to compensation for mental anguish damages, (c) the trial court abused its discretion in admitting the expert testimony of Dr. Miles Burke as to causation, (d) the trial court abused its discretion in excluding evidence of nystagmus unrelated to ROP, and (e) the evidence is legally and

factually insufficient to support the jury's findings on causation and damages. Because the fifth issue is dispositive, we address it first. *See* Tex.R.App. P. 47.1.

## Facts Relative to Dr. Perdue

Dr. Perdue, a board-certified pediatrician, had been working for All Saints since 1996 when she treated the twins. She did not treat infants weighing less than 1500 grams, but she did treat premature infants once they had been released from a NICU. Dr. Perdue testified that ROP is an inflammatory process in the vessels or retinas of premature babies, but denied that she knew how the disease progresses.

She first saw the twins on March 20, 1997, but did not create a referral to Dr. Gross for both twins until May 8, 1997. Dr. Perdue's office faxed a request to Dr. Yee for his records on the twins on March 27, 1997. Dr. Perdue testified that the prematurity of the twins was significant, as well as the fact that they had been in the NICU and had been rehospitalized in February and March 1997 for apnea and gastroesophageal reflux. She knew the original discharge summary for one child indicated a diagnosis of ROP and that an ophthalmology appointment had been scheduled for both twins with Dr. Gross upon their original discharge. The discharge summary from the Harris NICU showed a stage 1 ROP diagnosis for Hunter. Dr. Perdue never talked to Dr. Yee or Dr. Gross about the children's diagnosis or treatment. Dr. Perdue's notes from her first exam of Hunter and Tyler noted, "Need eye exam post-NICU, Doctor Gross."

The twins' second visit with Dr. Perdue was on March 31, 1997. At both visits she knew they were supposed to see Dr. Gross

10. In light of this holding we need not address Dr. Gross's factual insufficiency argument or his remaining issues. *See* Tex.R.App. P. 47.1.

as a result of his examination in the NICU, yet testified that at the time of the first two appointments she did not know *why* they needed to see a pediatric ophthalmologist. She did not fill out a specialty referral for either twin at either of the first two appointments, despite Alyssha telling her they both needed eye exams and the fact that the discharge summaries showed they did also. Dr. Yee's records showed that he had previously done the referral necessary for their appointments with Dr. Gross, which was ready on February 19. Dr. Yee mailed his records, including the discharge summaries, on March 27, 1997, and Dr. Perdue testified that if she had those records before their March 31 checkup, she would have reviewed them. On March 31 the twins' gestational age would have been about forty-three weeks.

The twins next went to Dr. Perdue's office on April 22, 1997. She performed another external eye exam on each twin, as she had done on the two prior visits, and noted that the exams were again "normal."[11] Dr. Perdue's notes on each chart state that the twins needed a subspecialty follow-up and referral to Dr. Gross. However, Dr. Perdue did not initiate a referral from her office in April either, even though by then she knew they needed the referral as early as March.

The twins' next visit to Dr. Perdue took place on May 5. After performing another external eye exam, she made another notation of "normal." Sometime on May 8, Dr. Perdue prepared a referral to Dr. Gross, but there is nothing in her records to show that her office communicated this to the parents. The referrals showed a tentative diagnosis by Dr. Perdue of ROP.

The twins' next visit was on June 9 when Dr. Perdue determined that Hunter's external eye exam was abnormal. On that day's entries she noted, "Subspecialty follow up on ophthalmology was planned." Dr. Perdue had no explanation as to why the referral had not been done in March, April, or May. Because Dr. Gross's schedule was so full in June, Dr. Perdue called another pediatric ophthalmologist, Dr. Antinone, who saw the twins on June 16, 1997. He reported that Tyler had grade 3 scarring or retinopathy of both eyes, and Hunter had grade 4 scarring in his left eye with some retinal detachment. They were both legally blind.

## Discussion of All Saints and Dr. Perdue's Fifth Issue

In their fifth issue, All Saints and Dr. Perdue contend that the evidence is legally and factually insufficient to support the jury's findings that Dr. Perdue's negligence proximately caused the children's injuries.[12] They contend that the testimony of Dr. Burke, the Burts' pediatric ophthalmology expert, with respect to causation is unreliable and, therefore, insufficient to sustain the jury's verdict that Dr. Perdue's negligence proximately caused the twins' injuries.

### Causation

All Saints and Dr. Perdue first contend that the evidence is legally and factually insufficient to show that Dr. Perdue's negligence deprived the twins of more than a fifty percent chance of a different outcome.

11. All doctors testified that an external eye exam is insufficient to detect early stages of ROP.

12. All Saints and Dr. Perdue also challenge the legal and factual sufficiency of the evidence on damages as well; however, because our opinion on causation is dispositive, we do not address the portion of their fifth issue complaining about the sufficiency of the evidence on damages. *See* Tex.R.App. P. 47.1.

They claim that by the time Dr. Perdue first saw the twins, there was less than a fifty percent chance that treatment would have saved their eyesight.

■■■ "The ultimate standard of proof on the causation issue is 'whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the [injury] and without which the harm would not have occurred.'" *Marvelli v. Alston*, 100 S.W.3d 460, 469 (Tex.App.-Fort Worth 2003, pet. denied) (quoting *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex.1995)). This standard effectively bars recovery when the defendant's negligence deprives the plaintiff of only a fifty percent or less chance of avoiding the complained-of harm. *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993). Thus, if at the time of the alleged negligence, the patient has a pre-existing condition from which the chance of recovery is fifty percent or less, recovery will be barred. *Id.*

The evidence at trial showed that treatment for ROP is not necessary until the disease reaches "threshold," which is determined by performing a specialized examination of the eyes. Treatment before threshold is generally not effective; however, treatment must usually occur within seventy-two hours of threshold to improve the ultimate outcome. All of the pediatric ophthalmology experts testified that they could not determine when Hunter's and Tyler's eyes reached threshold because no one had performed an examination until long after threshold had occurred. Dr. Burke, a pediatric ophthalmologist, testified that the twins reached threshold. Dr. Sandra Brown, also a pediatric ophthalmologist, agreed that both of the twins'

eyes reached threshold. Dr. Gross testified that he could not say whether they ever reached threshold.

When Dr. Perdue first saw the twins on March 20, 1997, they were around forty-one and a half weeks' postconceptional age. At that visit, Alyssha told Dr. Perdue that the twins had missed appointments with Dr. Gross; however, Dr. Perdue testified that Alyssha also told her the twins had had no eye problems while in the NICU.

## Dr. Burke

Dr. Burke was the Burts' pediatric ophthalmology expert and testified that Dr. Perdue's negligence was the proximate cause of the twins' injuries. Dr. Burke has been a practicing pediatric ophthalmologist since 1979. From 1979 to 1998, he was Director of the Department of Pediatric Ophthalmology at Children's Hospital Medical Center in Cincinnati, Ohio. He was in private practice at the time of trial. Dr. Burke was one of the principal investigators for the CRYO–ROP study, which is the leading study of ROP in premature infants. He was also an examiner and certifying ophthalmologist in another study known as STOP–ROP. Dr. Burke estimated that he had examined over twenty thousand premature infants' eyes for ROP.

Dr. Burke testified that, had Dr. Perdue arranged for an emergency referral to a pediatric ophthalmologist when she saw the twins in late March and had the twins received appropriate treatment, they would have had nearly normal vision. He based this opinion on his personal experience with patients and his involvement in the CRYO–ROP study.[13] However, Dr. Burke also testified that the twins reached threshold between thirty-seven and forty-

---

**13.** Dr. Burke admitted that the heaviest weight of the children in the CRYO–ROP study was 1,250 grams; therefore, Hunter barely fell within the weight limits of the children studied, and the study was not applicable to Tyler.

eight weeks postconception. On cross-examination, Dr. Burke testified that for babies between 1000 to 1250 grams at birth, "the median for that birth weight [of threshold] was 37.3 weeks, and the standard deviation ranged between 33.7 weeks to 42.9 weeks." Then,

> [i]f one uses the usual range for development and identification of threshold disease, an examiner should have been able to identify threshold ROP between January 26th and March 31st, 1997. This suggests that had these infants been examined any time later than early April, the chance of treatment preserving vision would already be very small.

Also on cross-examination, Dr. Burke testified that, based on the article "Incidence and Early Course of Retinopathy of Prematurity," which Dr. Burke referred to as the "bible" for the study of ROP, the majority of infants studied had reached threshold by forty-one and a half weeks postconceptional age, and at forty-two weeks, ninety-five percent had reached threshold. He agreed that there was a ninety-five percent probability based on the CRYO–ROP data that Hunter and Tyler had reached threshold before their first visit with Dr. Perdue. Dr. Burke also agreed that some higher birth weight babies, like Hunter and Tyler, reach threshold earlier and that he could not say exactly when the twins reached threshold because no examinations were done until after they had reached it.

Dr. Burke testified that he did not believe the twins were suffering from severe ROP when they first saw Dr. Perdue, but he agreed that based on the CRYO–ROP data, the odds are ninety-five percent or better that the twins passed threshold before seeing her. On further cross-examination, Dr. Burke stated that in trying to determine when the twins had developed ROP, he had "placed a range in terms of when [he] thought" it occurred, based on statistics. He admitted that he could not say for sure when the children reached threshold and that because it could not be determined, it could only be based on "qualified previous information." When cross-examined on his notes for the case, Dr. Burke noted that he used the natural history statistics from the CRYO–ROP study to determine the percentage of risk that the Burt twins had of developing ROP.

Dr. Burke admitted that at the time of trial the recommended standard [14] was that at least one eye should be treated within seventy-two hours of a diagnosis of threshold, saying that "we think it's the prudent [standard]." However, Dr. Burke stated that there is no way of determining from the study if treatment occurring more than seventy-two hours after a doctor first notes threshold in an examination would be effective. He agreed that seventy-two hours is the accepted standard of care. But Dr. Burke also testified that it has not been proven whether treatment more than seventy-two hours after threshold is observed is efficacious. He stated that he had treated some patients ninety-six hours after observing threshold, and they had done as well as the patients treated within seventy-two hours. Dr. Burke agreed, though, that in attempting to prevent blindness, therapy must be done within forty-eight to seventy-two hours; however, he indicated that he could not tell when the seventy-two hour window

14. This standard was from the Joint Statement of the American Academy of Pediatrics, American Association for Pediatric Ophthalmology, and the American Academy of Ophthalmology on Screening Examination of Premature Infants for Retinopathy of Prematurity, which Dr. Burke testified was the standard of care for ROP screening and treatment at the time of trial.

occurred in the twins' eyes. He further agreed that treatment does not cure ROP, but may modify the course of the disease.

Reading from the article "Prognostic Factors in the Natural Course of Retinopathy of Prematurity," which Dr. Burke agreed was peer-reviewed and reliable, Dr. Burke noted that "[o]verall, the eyes resulting in an unfavorable macular outcome went from the onset of ROP to threshold in only about 17 days, which was about nine days faster than the eyes that fared well." He agreed that the article determined that, on average, bad macular outcome in infants with ROP progressed very rapidly, within seventeen days from the onset of ROP.

Dr. Burke testified that appropriate treatment for threshold is "[v]ery often . . . highly successful" for babies of similar age and weight as Hunter and Tyler and that "[a]lmost every single patient [he had] followed that has been treated for threshold has very good vision." On cross-examination, however, Dr. Burke admitted that approximately forty-seven percent of the children in the CRYO–ROP study who were treated for threshold disease became blind.

### Dr. Gross

Dr. Gross testified that the vast majority of infants who reach threshold do so by forty-two weeks and that forty-two weeks was too late for Hunter to have been screened for the first time after he was discharged from the NICU. He explained that, based on the CRYO–ROP study, threshold means the point at which treatment helps and that, statistically, treatment before threshold hurts rather than

helps. Treatment should be administered at threshold to be effective; the CRYO–ROP study suggests treatment should occur no later than seventy-two hours after threshold. Dr. Gross testified that, with treatment, a majority of patients had a successful outcome and defined a success story as better outcome, not necessarily perfect vision. Dr. Gross said that there is no cure for ROP.

### Dr. Lonn Lockhart

Portions of the video deposition of Dr. Lonn Lockhart, one of Dr. Perdue's pediatric ophthalmology experts, were introduced into evidence. Dr. Lockhart testified that the examination process for ROP is specialized and is normally done by a pediatric ophthalmologist or retinal specialist. On cross-examination, he admitted that a small percentage of infants develop ROP after forty-two weeks and that those children are in the same birthweight group as the twins.[15] Dr. Lockhart believed that if the twins had been treated timely, they would have had a greater than fifty percent chance that treatment of each of their eyes would have been successful.

When questioned about his opinion on whether the twins' eyes worsened between March 20, 1997 and June 19, 1997, Dr. Lockhart opined that "early, very early in that period of time, they probably reached Grade 3 or cicatricial Stage III early in that period of time" and that "it's probable that their Stage III worsened some in between 3/20 and whatever date thereafter." Dr. Lockhart admitted he did not know when the twins reached threshold, so his opinion was based on experience and, in large part, on statistics from reviewed

15. Specifically, Dr. Lockhart testified that the twins' birthweights were "fairly high in a group of infants that are premature that are studied and examined and treated for" ROP and that "there are two groups . . . in the

literature. Some of the larger kids take longer to develop retinopathy of prematurity of any stage. And there is a subset of a group of bigger kids that tend to develop it a little earlier. . . . [I]t falls both ways."

literature. He could not say whether the twins were in the ninety-five percent or the five percent group, and the only way to opine about when they reached threshold was by using the available statistics.

Dr. Lockhart was of the opinion that "[m]ore likely than not [the twins] could not have been successfully treated at 43 weeks, based upon [his] experience and training." He testified that most children with threshold ROP are successfully treated between thirty-six to thirty-eight weeks; he did not believe that intervention between March 20 and June 19, 1997 would have had a "significant effect on [the twins'] outcome."

**Dr. Sandra Brown**

Dr. Brown,[16] another pediatric ophthalmology expert designated by Dr. Perdue, testified that she could not say when the twins reached threshold, but could only make a prediction based on epidemiologic studies. According to Dr. Brown, the optimum time for detection and treatment of threshold ROP in the twins was several weeks before their first visit with Dr. Perdue. Dr. Brown stated that, in her opinion,

> there is a greater than 51 [percent] probability that [the] children were past threshold by the time they arrived in [Dr. Perdue's] office for [their] first visit. And that even if she had arranged for immediate referral for them, that the likelihood that there would have been a significantly improved functional outcome for either eye of either child is very small.

Dr. Brown testified that at four months chronologic age, the twins' chance of being in an "active stage of [ROP] was vanishingly small." She explained that no information exists showing that treatment is effective beyond seventy-two hours after threshold because no one that treats premature infants for ROP is willing to wait longer to treat threshold ROP. In fact, Dr. Brown testified that treatment was usually scheduled either the same night or the next day after an examination where threshold was first observed and that doctors try to treat threshold quickly.

According to Dr. Brown, "unless you assume that [the twins] crossed threshold ... two days before they saw Doctor Perdue, there is a reasonable medical probability that they were in a very severe stage of disease by the time they reached her office." Dr. Brown was unable to say when a particular child would reach threshold; she could only make a prediction based on statistics. Dr. Brown testified that the median occurrence of threshold is at 36.9 weeks, which means that half of the children will have reached threshold by then and half will not. Fewer than five percent will reach threshold after forty-two weeks post-conception, but there is no way of knowing which child will be in that five percent.

Dr. Brown stated that the basis for her opinion that the twins probably would not have had a better outcome if Dr. Perdue had timely arranged for referral was "The Natural History of Retinopathy of Prematurity" and "The CRYO–ROP Treatment Trial" both of which Dr. Burke relied on for his opinion. She further relied on Table 5 of the article, "Incidence and Early Course of Retinopathy of Prematurity." Based on these publications, Dr. Brown opined that "much more likely than not, ... both eyes of both children had reached threshold and could potentially have been in threshold for a significant period of time prior to their first visit with Doctor Per-

**16.** Two Dr. Browns testified in this case, Dr. Sandra Brown and Dr. Michael Brown. All references in this opinion to "Dr. Brown" are to Dr. Sandra Brown.

due, which was at about 41.5 to 42 weeks of post-conception age."

Dr. Brown explained that outcomes could only be predicted based on statistical models because, without results from a specialized examination of the children, there is no way of knowing when the children reached threshold. However, the studies "allow[ ] us to predict the most likely course of [the twins' ROP] in the absence of other information." According to Dr. Brown, it was more likely than not that the twins were at threshold a week before they saw Dr. Perdue, and "it is more likely that they had been at threshold for some period of time."

Dr. Brown testified that only one article had been written about the effect of a delay in treatment. In that study, the doctor treated seven children with "late Stage III plus disease" outside the seventy-two-hour window, and all seven had unfavorable outcomes. Dr. Brown stated that it was more likely than not that the twins reached threshold at thirty-seven weeks.

On cross-examination, Dr. Brown admitted that she could not say whether treatment within two days of threshold was any better than treatment within ten days of threshold. She agreed that, had Dr. Perdue referred the twins to a pediatric ophthalmologist after she received their medical records in late March 1997, then we would know whether the twins had reached threshold by then. Dr. Brown also testified on cross-examination that "[i]f they had passed threshold one day before seeing [Dr. Perdue], then they have the same likelihood of an improved outcome as any other child who had been screened all along and observed to approach and then crossed threshold."

### Summary of Testimony Regarding Timing of Threshold

All of the experts agreed that because there is no way of knowing exactly when the twins reached threshold, they could only make an educated guess based on statistics. Dr. Burke relied on the statistics from the CRYO–ROP study in making his predictions about when the twins reached threshold. According to the CRYO–ROP study, 37.3 weeks was the median age threshold occurred in infants within Hunter's birthweight range. Thus, we must assume, for purposes of determining whether there was a fifty percent or greater likelihood that Hunter's eyes could have been successfully treated, that he reached threshold no earlier or later than the median age for his birthweight group. The question then becomes whether treatment administered approximately four weeks after Hunter statistically had likely reached threshold (when Dr. Perdue first saw him at 41.5 weeks) would have been effective in saving his eyesight. There was no evidence at trial of a median threshold age for babies in Tyler's birthweight range because babies of his birthweight were not included in the CRYO–ROP study.

In their briefs and their motion for rehearing, the Burts contend that in determining whether Dr. Burke's causation testimony is reliable we should review, in addition to trial testimony, evidence the Burts attached to their response to All Saints and Dr. Perdue's pretrial motion to exclude Dr. Burke's testimony, which was not admitted at trial. It is not clear whether an appellate court must take into account evidence pertinent to the issue of reliability that is reviewed by the trial court at the pretrial stage, but not later admitted at trial, when determining the reliability of expert testimony for legal sufficiency purposes. *See Exxon Corp. v. Makofski,* 116 S.W.3d 176, 181–82, 196–97 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (Seymore, J., dissenting) (majority

opinion stating, in the context of determining whether Exxon waived legal sufficiency challenge by not including in record pretrial hearing on motion to exclude expert's testimony, that "we normally test the legal sufficiency of a jury verdict by the evidence at the jury trial, not by what happened before or after it"). In his dissent in *Makofski*, Judge Seymore cites commentators who favor appellate court review of such pretrial evidence. They contend that because the proponent of the expert testimony has already prevailed in the trial court's pretrial determination of their expert's reliability, it might not (or fail to) re-offer its underlying pretrial evidence. *See id.* at 196 (citing Judge Harvey Brown, *Procedural Issues Under Daubert,* 36 Hous. L.Rev. 1133, 1139 (1999)). The Brown article also states that "the evidence from the hearing will be considered in determining both the admissibility and, indirectly, the sufficiency of the evidence, even if the evidence is not fully presented to the jury." Brown, *supra,* at 1139.

Here, it is apparent from the trial judge's response to All Saints and Dr. Perdue's trial objection to Dr. Burke's testimony that the judge reconsidered the pretrial evidence submitted by the parties in ruling on the objection. Thus, the trial judge reconsidered that evidence at trial in evaluating the reliability of Dr. Burke's testimony. Thus, we have also included that evidence in our legal sufficiency review. Regardless, because that evidence is consistent with Dr. Burke's testimony at trial, it has no impact on our conclusion.

In his affidavit, Dr. Burke testified that

"[t]he CRYO–ROP study ... included only infants [weighing] 1250g at birth or less. Infants [weighing] 1251g or greater at birth were excluded from the study. This is significant in this case because Tyler weighed 1401g at birth

and, therefore, the findings of the study can not be applied to him."

. . . .

"The CRYO–ROP study can not be used to determine when a particular infant will develop threshold disease. It can not be used to determine when Hunter Burt or Tyler Burt developed threshold disease. Had Hunter or Tyler been timely screened for ROP, when their threshold disease occurred would not be in question. Because those screening evaluations did not occur, we only know that they developed threshold disease at a time prior to June 19, 1997 and that it progressed to retinal scarring and detachment at a time prior to June 19, 1997."

. . . .

"The CRYO–ROP study showed that 95% percent of *those infants studied* whose birth weight was less than 750g and who reached threshold, did so by 40.7 weeks postconceptional age. The study showed that 95% percent of *those infants studied* whose birth weight was between 750 and 999g and who reached threshold, did so by 41.9 weeks postconceptional age, almost one week after the lowest birth weight group. The study showed that 95% percent of *those infants studied* whose birth weight was between 1000–1250g and who reached threshold, did so by 42.9 weeks postconceptional age, one week after the middle birth weight group."

"Hunter's birth weight was 1170g. If included in the study, Hunter falls within the heaviest birth weight group. Therefore, even if we make the assumption that Hunter is like the 95% of those infants studied within his birth weight group, he would have reached threshold by March 31, 1997 and likely would have stayed in threshold until sometime later in April."

"Because Tyler's birth weight was significantly higher, 1406g, within reasonable medical probability, he reached threshold at a later postconceptional age than Hunter. Again, infants with a birth weight of over 1250g were not studied. However, using the increments shown in the study, according to the study Tyler would have reached threshold by April 7, 1997 and likely would have stayed in threshold until at least mid April. Even if the CRYO–ROP was an epidemiological study that could be used to determine when Hunter and Tyler Burt more likely than not reached threshold, it would still be at a time after Dr. Perdue began treating them. According to the study, it would have been after the first visit, after she received the medical records from Dr. Yee and after the second visit."

The Burts contend that these statements in Dr. Burke's affidavit support the reliability of Dr. Burke's conclusion that more likely than not the twins' eyesight could have been successfully treated if Dr. Perdue had referred them for treatment when she first saw them. We disagree.

On the one hand, Dr. Burke says the CRYO–ROP data cannot be used to predict when Hunter and Tyler reached threshold, then he proceeds to use that same data to conclude that they more likely than not reached threshold and re-mained at threshold during the time period that they were seen by Dr. Perdue. Further, using Dr. Burke's logic, i.e., that Hunter was like the infants in his birthweight group, he more likely than not reached threshold around the time of the median age of that group, or 37.3 weeks. Using the same logic, Tyler, as a larger child whose birthweight was not studied, reached threshold one week later, or 38.3 weeks. Thus, Dr. Burke's reasoning supporting his conclusions is based on the statistics in the CRYO–ROP study, which shows that Hunter was most likely at threshold at least four weeks before he saw Dr. Perdue, and Tyler was most likely at threshold at least three weeks before he saw Dr. Perdue.[17]

We next turn to the evidence regarding whether, if Hunter and Tyler reached threshold by 37.3 and 38.3 weeks respectively, there was a fifty percent or greater chance that their eyesight could have been successfully treated if Dr. Perdue had immediately referred them for an examination.

### Reliability of Dr. Burke's Testimony on Causation

While Dr. Perdue's experts agreed with Dr. Burke that the twins' eyes reached threshold, they disagreed on when that threshold could effectively be treated. Drs. Burke, Lockhart, and Brown all

---

17. The median represents that point in which half of those infants in a particular group had already reached threshold and half had not. Because all of the experts agree that there is no way of knowing whether Hunter or Tyler were in the first half or second half, the only logical assumption when trying to decide whether they had more likely than not (or a fifty percent or greater chance) reached threshold is that they reached threshold at the median age for their respective birthweights. Because even this assumption is speculative, it casts even further doubt on the reliability of Dr. Burke's challenged opinion regarding the success of treatment of the twins' eyes when Dr. Perdue took over their care.

The Burts claim in their motion for rehearing that our opinion fails to view the causation evidence in the light most favorable to them. We cannot, however, assume or infer that Hunter reached threshold later than the statistical median age for his birthweight group, nor can we assume or infer that Tyler reached threshold at a later date because his birthweight group was not even studied. Such inferences are not reasonable because they are not supported by the record.

agreed that it was impossible to determine when the twins reached threshold and that they could only say that, based on available statistics, the twins more likely than not reached threshold before their first visit with Dr. Perdue. However, only Dr. Burke opined that, even considering that the twins probably already reached threshold by March 20, 1997, they still had a better than fifty percent chance of improvement if Dr. Perdue had immediately referred them for treatment. All Saints and Dr. Perdue contend that this opinion of Dr. Burke's is unreliable; thus, the evidence is legally and factually insufficient to prove that Dr. Perdue's negligence proximately caused the twins' injuries.[18]

■■■■ Expert testimony must be relevant to the issues in a case and be based on a reliable foundation. TEX.R. EVID. 702; *Robinson,* 923 S.W.2d at 553; *Marvelli,* 100 S.W.3d at 475. The trial court must make an initial determination of whether the expert's testimony is relevant and reliable so as to be admissible. *Robinson,* 923 S.W.2d at 557; *Marvelli,* 100 S.W.3d at 475. However, even when challenged expert testimony is admitted by the trial court, a party may later complain on appeal that the expert testimony is legally insufficient to support the judgment because it is unreliable. *Maritime Overseas Corp.,* 971 S.W.2d at 409; *Austin v. Kerr–McGee Refining Corp.,* 25 S.W.3d 280, 285 (Tex.App.-Texarkana 2000, no pet.). Unreliable expert testimony is not evidence.

*Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997), cert. denied, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *Marvelli,* 100 S.W.3d at 475.

■■■■ In determining whether expert testimony is reliable and, therefore, some evidence supporting the judgment, the appellate court must employ "an almost de novo-like review and, like the trial court, look beyond the expert's bare testimony to determine the reliability of the theory underlying it." *Austin,* 25 S.W.3d at 285; see *Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 808 (Tex.2002); *Havner,* 953 S.W.2d at 713. "An expert's simple ipse dixit[19] is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) (footnote added). The court does not focus on the correctness of the expert's opinion, but on the reliability of the analysis the expert used in reaching his or her conclusions. *State Farm Fire & Cas. Co. v. Rodriguez,* 88 S.W.3d 313, 319 (Tex.App.-San Antonio 2002, pet. denied) (op. on reh'g).

■■■■ The supreme court has articulated six nonexclusive factors appellate courts should consider in determining whether scientific testimony is reliable:

(1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3)

18. The Burts contend that All Saints and Dr. Perdue did not preserve error on this issue because at trial, their counsel, rather than making his own objection to Dr. Burke's testimony, joined in Dr. Yee's objection, which incorporated the terms of Dr. Yee's motions to strike and exclude Dr. Burke's testimony. These motions did not raise some of the grounds raised in All Saints and Dr. Perdue's motion to exclude. However, it is clear from the trial judge's response that he understood the joint objections to renew and incorporate

*all* previous objections to Dr. Burke's testimony, including All Saints and Dr. Perdue's prior written motion to exclude. Therefore, the complaint was preserved. See TEX.R.APP. P. 33.1(a).

19. The term "ipse dixit" means "something asserted but not proved" and is literally translated "he himself said it." *Marvelli,* 100 S.W.3d at 478 n. 6 (citing BLACK'S LAW DICTIONARY 833 (7th ed. 1999)).

whether the theory has been subjected to peer review and publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique.

*Havner*, 953 S.W.2d at 714; *Robinson*, 923 S.W.2d at 557. Scientific evidence that is not based on "the methods and procedures of science" is no more than a "subjective belief or unsupported speculation." *Robinson*, 923 S.W.2d at 557. "If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." *Havner*, 953 S.W.2d at 714. In addition, if the expert's conclusions from data are based upon flawed methodology, the testimony is unreliable even if the data is sound. *Id.*

■ The Texas Supreme Court has recognized that the *Robinson* analysis may not apply to certain types of expert testimony. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex.1998)). In these types of cases, there must still be a reliable basis for the expert's opinion. *Id.* "Experience alone may provide a sufficient basis for an expert's testimony" unless there is "too great an analytical gap between the data and the opinion proffered." *Gammill*, 972 S.W.2d at 726–27. Thus, regardless of whether the *Robinson* factors are applied, the proponent of the expert testimony must prove that it is based upon a reliable foundation. *Rodriguez*, 88 S.W.3d at 319.

■ All Saints and Dr. Perdue contend that Dr. Burke's opinion that the twins could have been successfully treated even if, statistically, they were already seventy-two hours past threshold when Dr. Perdue first saw them, is unreliable and, therefore, no evidence that Dr. Perdue proximately caused the twins' injuries. As was the case in *Havner*, the issue before us is not whether Dr. Burke possesses adequate credentials, skill, or experience to testify about the cause of the twins' injuries. *See Havner*, 953 S.W.2d at 711. All Saints and Dr. Perdue do not challenge Dr. Burke's qualifications. He had been involved in two major studies of ROP, had co-authored between twenty-five and thirty articles on the subject, and had significant firsthand experience in treating infants with the disease. Rather, the issue is whether Dr. Burke's opinion regarding the success of treatment in this particular case is based on a reliable foundation.

In his affidavit attached to the Burts' response to All Saints and Dr. Perdue's pretrial motion to exclude, Dr. Burke states the following:

"My opinions, as discussed in this affidavit and my deposition, regarding the timing of threshold disease and the effectiveness of treatment have been well tested and are well documented in numerous peer reviewed articles and studies. These opinions are an objective interpretation of the data and have been adopted by and generally accepted as valid by myself and my colleagues. As a pediatric ophthalmologist, I have personally examined thousands of eyes for retinopathy of prematurity and my opinions are supported by my vast clinical experience."

This is merely a conclusory statement, however; therefore, we must look to other evidence to determine if Dr. Burke's opinion is based upon a reliable foundation. *See Robinson*, 923 S.W.2d at 559 (holding doctor's "self-serving statements that his methodology was generally accepted and

reasonably relied upon by other experts in the field" insufficient to "establish the reliability of the technique and theory underlying his opinion").

In his affidavit, Dr. Burke stated that:

"The CRYO–ROP study is not an epidemiological study on when it is too late to treat threshold disease. The purpose of the study was to show the natural history of the disease in order to increase the efficacy of treatment, not to show when treatment would not be beneficial. In fact, the infants included in the study were screened at two week intervals and if and when threshold disease was detected, treatment was performed within 42–72 hours. This 42–72 hour time period was picked arbitrarily and is not and was not intended to mean that ROP remains at threshold disease for up to 72 hours. When threshold disease was detected in the studied infants, it very well *could* have been present for as long as two weeks, or the time period since the last screening. *No other screening schedule was tested* and no other time period between threshold detection and treatment was tested." [Emphasis added.]

In addition to Dr. Burke's affidavit, the deposition testimony of Dr. James Reynolds, a pediatric ophthalmologist hired by Dr. Gross, was attached to the Burts' response to All Saints and Dr. Perdue's motion to exclude. When discussing the relevant dates for predicting when the twins reached threshold, Dr. Reynolds stated that:

There's no one, no expert that can tell you when things happened in these babies because we have no retinal findings to guide us; however, if we say where do these babies fit on the bell curve of the population statistics of the natural history of this disease, we can answer those things. We can say, This is the natural history of this disease, this bell curve encompasses the entire population, and then you can say, Well, where would they be on the curve at X time? That doesn't mean that their disease followed an average course at all. It just means that it had to follow an average course, it had to follow an exceptional course. It followed a course, and I doubt whether the course that these two followed is outside the natural history of this disease.

When asked if he had an opinion on the latest date that treatment of the twins would have been effective, Dr. Reynolds stated:

No. I think that opinion is not possible at—as of a certain date. In other words, I can tell you the population statistics and I can tell you when the last date on a large population and which patients went to pre-threshold disease, the last date—well, let's say 99 percent, I can tell you the 99 percentiles of latest pre-threshold, latest threshold, but it would be very difficult, even knowing population statistics, to tell you there is a date upon which I am sure that the window of opportunity for treatment is past.

He went on to testify as follows:

[Dr. Reynolds:] I don't think there is anything to suggest that treatment within three days of Zone 2 threshold retinopathy of prematurity is better than treatment within five days. That was never studied, it has never been determined, and in my clinical expertise personally I would say there is no difference in Zone 2 disease as opposed to Zone 1 disease.

. . . .

. . . . Patients can stay at threshold for a very short time before they develop a detachment. Patients can stay at

threshold for quite a long time before they develop a detachment.

. . . .

[Dr. Perdue's counsel:] But certainly when you do note that an infant has reached threshold in an eye, you don't delay therapy.

[Dr. Reynolds:] Correct. That was the—you know, the by-product of an arbitrary protocol [the treatment within 72 hours standard recommended as a result of the CRYO–ROP study] is that everybody says this treatment works in this framework, let's everybody do it in this framework.

. . . .

[Dr. Reynolds:] *But it might have worked just as well if five days was the limit.*

[Dr. Perdue's counsel:] *Might or might not have; you don't—*

[Dr. Reynolds:] *Right, it might not have.*

[Dr. Perdue's counsel:] *You don't know that, do you?*

[Dr. Reynolds:] *Don't know that.*

[Dr. Perdue's counsel:] What we do know is that it's recommended that the therapy be administered between 24 and 72 hours of threshold.

[Dr. Reynolds:] Correct.

[Dr. Perdue's counsel:] *And that's the best medical statistic we have on efficaciousness of ablative therapy.*

. . . .

[Dr. Reynolds:] Right, it's the only protocol that has been tested. *No other protocol with a different window was ever tested.*

. . . .

[Dr. Reynolds:] That time window has been proven safe and efficacious. No other time window has been tested. We

do know that threshold can last longer because we have had controls.

. . . .

[Dr. Reynolds:] But controls now are not acceptable. The standard of care is 24/72.

[Dr. Perdue's counsel:] Controls or case reports are anecdotal?

[Dr. Reynolds:] No, no. Controls are not . . . . the studies have always had—we followed the natural history of patients we purposely didn't intervene on. [Emphasis added.]

Dr. Burke admitted at trial that there were no studies supporting his theory that threshold disease could be treated effectively outside the seventy-two hour window recommended by the CRYO–ROP study and other studies because no physician would knowingly withhold treatment upon an observation of threshold ROP. *See Couch v. Simmons,* 108 S.W.3d 338, 341–43 (Tex.App.-Amarillo 2003, no pet.) (holding evidence supported trial court's finding that expert's testimony—that earlier administration of IV fluids would have prevented patient's stroke—was unreliable and inadmissible because expert's own affidavit stated that theory had not been tested because no physician would intentionally withhold IV fluids to test theory and two peer-reviewed articles expert relied on indicated that there is no "specific beneficial relationship" between administration of IV fluids and stroke outcome); *Helm v. Swan,* 61 S.W.3d 493, 498 (Tex.App.-San Antonio 2001, pet. denied) (holding unreliable expert testimony that earlier intravenous fluid therapy would have improved patient's chances of recovery from severe necrotizing pancreatitis because no medical literature supported the opinion and noting that such support was absent because "no medical professional would intentionally delay" the therapy). Additionally, in the only study cited by any of the

pediatric ophthalmology experts where treatment did not occur within seventy-two hours of threshold, none of the patients achieved a positive outcome. Furthermore, Dr. Burke's testimony regarding his own personal experience supports only the conclusion that treatment within ninety-six hours after observing threshold has been effective in his patients. *Cf. In re D.S.*, 19 S.W.3d 525, 529–30 (Tex.App.-Fort Worth 2000, no pet.) (holding that expert's testimony, based on experience alone, that a child had been forcibly immersed in hot water was reliable when expert's theory was not subject to human testing because it would be immoral, expert had over twenty-five years' experience treating child and adult burn victims, and expert explained how burn patterns correlated to a person's typical response to contact with hot liquids). Thus, the record before us, including Dr. Burke's pretrial affidavit, shows no basis for Dr. Burke's opinion other than his belief that treatment beyond ninety-six hours after threshold would have been effective. *See Makofski*, 116 S.W.3d at 188–89 (holding—after concluding that studies cited by some of the appellees' experts did not support their opinions and that one of appellee's expert's opinions had no basis— that expert's "belief that a substance might cause a disease is no evidence that in reasonable probability it did").

■ Had Dr. Burke been able to testify to any personal knowledge or experience or any scientific data supporting his theory that treatment more than ninety-six hours after threshold would have resulted in a better outcome for the twins' eyes, the outcome of our analysis would likely be different. However, based on the evidence before us, there is no reliable foundation for Dr. Burke's testimony that the twins' eyesight would have been improved if Dr. Perdue had referred them for treatment when she first saw them. Thus, the only conclusion supported by reliable evidence is that the twins had more likely than not reached threshold and passed the seventy-two-hour window for treatment (and even the ninety-six-hour window that Dr. Burke testified he had personally observed) before being seen by Dr. Perdue. Because the only reliable evidence shows that there was a fifty percent or greater chance that the twins could not have been successfully treated by the time Dr. Perdue took over their care, any acts or omissions of Dr. Perdue could not have been a substantial factor in causing the twins' injuries; therefore, the Burts cannot recover for any negligence of Dr. Perdue. *See Kramer*, 858 S.W.2d at 400.

We hold that, under either the six *Robinson* factors or the *Gammill* analytical gap test, Dr. Burke's testimony that Dr. Perdue's negligence proximately caused the twins' injuries is unreliable,[20] and, therefore, constitutes no evidence that Dr. Perdue's negligence was a proximate cause of the twins' injuries. *See Havner*, 953 S.W.2d at 730. Because there is no scientifically reliable evidence to support the jury's verdict that Dr. Perdue's acts or omissions were a proximate cause of the twins' injuries, we sustain All Saints and Dr. Perdue's fifth issue.[21]

### Modification of Interest Rates to Judgment

In post-submission briefs, Dr. Gross, All Saints, and Dr. Perdue have asserted that

20. Our holding on reliability is limited solely to Dr. Burke's conclusion that the twins still had a better than fifty percent chance of improvement if Dr. Perdue had immediately referred them for treatment, notwithstanding the fact that the twins had more likely than not reached threshold by March 20, 1997.

21. In light of our holding on this issue, we need not address their remaining issues. *See* Tex.R.App. P. 47.1.

recent changes to the Texas Finance Code should apply to the pre- and post-judgment rates used by the trial court in computing its judgment. TEX. FIN.CODE ANN. § 304.003(c) (Vernon Supp.2004). Because we are rendering judgment in their favor, the question of whether the new rates of interest apply is mooted, and we do not need to address it here. *See., e.g., Williams v. Lara,* 52 S.W.3d 171, 184 (Tex. 2001); *Valley Baptist Med. Ctr. v. Gonzalez,* 33 S.W.3d 821, 822 (Tex.2000). *See generally Columbia Med. Ctr. v. Bush,* 122 S.W.3d 835, 866 (Tex.App.-Fort Worth 2003, pet. denied) (holding new interest rates do not apply to cases pending on appeal on statute's effective date).

## Conclusion

Having sustained Dr. Gross's first and fifth issues, we reverse the trial court's judgment against him and render judgment in his favor. Likewise, having sustained All Saints and Dr. Perdue's fifth issue as to causation, we reverse the trial court's judgment against them and render judgment in their favor.

WALKER, J., filed a dissenting opinion.

SUE WALKER, Justice, dissenting on rehearing.

### I. INTRODUCTION

I respectfully dissent from the majority's disposition of Dr. Gross's appeal. The evidence does not conclusively establish termination of the physician-patient relationship between Dr. Gross and Hunter, and viewing the evidence in the light most favorable to the jury's verdict and disregarding all contrary evidence and inferences, the evidence is legally sufficient to support the deemed finding that at the time in question Hunter Burt was Dr. Gross's patient with respect to Hunter's retinopathy of prematurity (ROP). Consequently, I would decline to reverse the trial court's judgment against Dr. Gross on the grounds articulated by the majority and would, instead, address Dr. Gross's remaining issues. Thus, I would grant rehearing en banc as to Dr. Gross.[1]

### II. PHYSICIAN-PATIENT RELATIONSHIP BETWEEN DR. GROSS AND HUNTER

Dr. Gross does not dispute that he had a physician-patient relationship with Hunter when he examined Hunter for ROP in the hospital. He stated below in the trial court that "[w]e are not taking the position that there was no relationship for the examination in the hospital." Instead, Dr. Gross claims in his first issue that "[w]ith respect to the jury's finding that Dr. Gross'[s] negligence caused any harm to Hunter Burt ... Dr. Gross'[s] limited physician-patient relationship with Twin B, a/k/a Hunter 'Taylor,' *terminated* upon completion of the ROP screen." [Emphasis added.]

Termination of an existing physician-patient relationship is an affirmative defense or a matter in avoidance which the physician bears the burden of pleading and proving. *Accord Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203, 212 (Tex.1996) (jury's finding of affirmative defense of justification rendered immaterial finding of actual malice); *Sunsinger v. Perez,* 16 S.W.3d 496, 500 (Tex.App.-Beaumont 2000, pet. denied) (discussing defendant doctor's motion for summary judgment on ground of affirmative defense that patient had terminated physician-patient relationship).

---

1. I do not believe, however, as urged by the opinion dissenting to the denial of en banc rehearing as to Dr. Gross, that en banc rehearing is necessary to determine the burden of proof to establish termination of or the ending of Dr. Gross's physician patient relationship with Hunter. Dr. Gross bore that burden.

Although Dr. Gross contended at trial and asserts on appeal that his physician-patient relationship with Hunter with respect to Hunter's ROP terminated following the in-hospital screening, he did not request a termination special question or instruction or object to the lack of such a question or instruction. Consequently, no such question or instruction was submitted.[2] If a party totally fails to request that a particular defense be included in the court's charge, it is waived unless it is conclusively established as a matter of law. *See* Tex.R. Civ. P. 279 (providing that upon appeal all independent grounds of recovery or defense not conclusively established under the evidence and upon which no issue is given or requested shall be deemed as waived); *see also Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 565 (Tex.2002) (recognizing that a party waives an entire theory of defense by not objecting to its omission from the charge); *Vickery v. Comm. for Lawyer Discipline,* 5 S.W.3d 241, 253 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (same).

Therefore, the issue presented by Dr. Gross's complaint that "[w]ith respect to the jury's finding that Dr. Gross'[s] negligence caused any harm to Hunter Burt ... Dr. Gross'[s] limited physician-patient relationship with Twin B, a/k/a Hunter 'Taylor,' terminated upon completion of the ROP screen" was waived, unless termination of the physician-patient relationship between Dr. Gross and Hunter was established as a matter of law. *See Gulf States Utils.,* 79 S.W.3d at 565; *see also Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515,

518 (Tex.1988) (holding discovery rule was independent ground of defense under rule 279 and that failure to request findings or object to charge not submitting discovery rule waived right to complain on appeal).

During the charge conference in this case, a lengthy debate occurred concerning whether to submit the Burts' requested jury special question on the existence of a physician-patient relationship between Dr. Gross and Hunter. *See* 3 Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges PJC 50.6 (2d ed. 2002) (setting forth a physician-patient relationship special question). Ultimately, counsel for Dr. Gross and for Hunter agreed that the trial court had found as a matter of law that a physician-patient relationship existed between Dr. Gross and Hunter, at least at the time of Dr. Gross's in-hospital examination of Hunter. Dr. Gross did not object to the omission of a physician-patient relationship special question from the charge. Consequently, to the extent Dr. Gross's first issue constitutes a challenge to the legal sufficiency of the evidence to establish a post-hospital-examination physician-patient relationship between Dr. Gross and Hunter, that finding is deemed in support of the judgment. *See* Tex.R. Civ. P. 279; *In re J.F.C.,* 96 S.W.3d 256, 262–63 (Tex.2002).

Under this analysis, the issue presented by Dr. Gross's "no evidence" complaint that "[w]ith respect to the jury's finding that Dr. Gross'[s] negligence caused any harm to Hunter Burt ... Dr. Gross'[s] limited physician-patient relationship with

---

**2.** If there is evidence of termination of a physician-patient relationship, section 50.6 of the Texas Pattern Jury Charges provides that the following may be submitted:

A physician-patient relationship does not exist when either the physician or the patient has terminated the relationship. A patient may terminate the relationship at

any time. The physician may terminate the relationship at any time if reasonable provision for adequate medical care is made or if the patient is not in need of continuing medical care.

3 Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges PJC 50.6 (2d ed. 2002).

Twin B, a/k/a Hunter 'Taylor,' terminated upon completion of the ROP screen" is whether legally sufficient evidence exists supporting the deemed finding of a physician-patient relationship between Dr. Gross and Hunter with respect to Hunter's ROP. In conducting this legal sufficiency analysis, we are required to view the evidence in the light most favorable to the jury's verdict and to disregard all evidence and inferences to the contrary. *See, e.g., St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002). Viewing the evidence in the light most favorable to the jury's verdict, disregarding all evidence and inferences to the contrary, more than a scintilla of evidence exists of a physician-patient relationship between Dr. Gross and Hunter with respect to Hunter's ROP following the in-hospital examination.

### A. Legally Sufficient Evidence Supports Deemed Finding of Physician–Patient Relationship

The parties agree that Dr. Gross had a physician-patient relationship with Hunter with respect to Hunter's ROP when he examined and diagnosed Hunter in the hospital on February 8, 1997. In 1996, the American Academy of Pediatrics, the American Association for Pediatric Ophthalmology and Strabismus, and the American Academy of Ophthalmology approved guidelines concerning screening premature infants for ROP. The guidelines state that infants with a birth weight of under 1500 grams or with a gestational age of 28 weeks or less should have a dilated indirect ophthalmoscopic examina-

tion to detect ROP. The examination should be carried out by an ophthalmologist with experience in the examination of preterm infants. This is the examination Dr. Gross conducted on Hunter to diagnose Hunter with ROP.

The American Academy of Pediatrics, the American Association for Pediatric Ophthalmology and Strabismus, and the American Academy of Ophthalmology also approved guidelines which state that infants with ROP, like Hunter, "should be seen at least every 1 to 2 weeks until normal vascularization proceeds to Zone III or the risk of attaining threshold conditions is passed." According to Dr. Gross, these guidelines constitute the standard of care for a pediatric ophthalmologist treating an infant with ROP.[3] Likewise, Dr. Burke, the Burt's expert, testified at trial that it was Dr. Gross's responsibility "to make sure that the follow-up examinations be carried out" and that Dr. Gross should have identified Hunter Burt as Hunter Taylor.

Dr. Yee testified that Dr. Kim Smith called him on February 12, 1997, and told him that the twins had a February 17, 1997 follow-up appointment with Dr. Gross because Hunter had been diagnosed by Dr. Gross as having ROP. Nonetheless, although he had six days, Dr. Yee did not complete Hunter's referral papers to Dr. Gross's office prior to the scheduled visit. Dr. Yee completed the referral papers on February 19, 1997, too late for Hunter to make the February 17 appointment with Dr. Gross.

---

**3.** Dr. Gross testified that, after he examined Hunter in the NICU, he recommended follow-up on Hunter because Hunter had ROP. Dr. Gross was asked:

> Q. Dr. Gross, using your definition of the standard of care, do you agree that in February of '97 the standard of care required that Hunter be followed up by a pediatric

ophthalmologist because he had a finding of immature retina?

> A. Yes.

Dr. Gross testified that he recommended a follow-up exam in two weeks. Alyssha scheduled an appointment with Dr. Gross before Hunter left the hospital.

Alyssha Burt testified that she learned on the evening of February 8 that Dr. Gross had examined Hunter's eyes in the hospital that day. The nurse told Alyssha that the exam was "great," "a one, the best." While the twins were still in the hospital, a nurse told Alyssha to call Dr. Gross and set up an appointment for the boys to have their eyes examined. She did, and the appointment was set for February 17. When she made the appointment, Dr. Gross's office did not mention the need for a referral. Alyssha had no idea why the Hunter needed to have his eyes examined other than simply because he was premature. Her only understanding was that "premature infants had to go" for ophthalmic exams.

Dr. Gross's office called Alyssha on Friday, February 14, before the scheduled Monday February 17 appointment, and told her that the office did not have the referral papers necessary for the appointment. The morning of the February 17, Alyssha talked with Dr. Yee's office and learned that the referral could not be completed in time for Hunter's eye appointment that afternoon. Alyssha called Dr. Gross's office and relayed this information; she was told to reschedule the appointment. She rescheduled it for February 28, but Hunter was in the hospital on that date with a virus.

Hunter's referral to Dr. Gross by Dr. Yee lists the patient's name as "Hunter W. Taylor (Burt)" and indicates that his parents are Alyssha Taylor and Keith Burt.[4] Dr. Gross testified that upon receiving

such a referral, his office should have checked under the last name of both Taylor and Burt to see if a corresponding appointment existed. Dr. Gross explained:

[I]f somebody's been seen in the hospital, then when we receive a call from the parent to schedule an appointment for a baby by the same name, then when we go to schedule that appointment, we immediately know that they've been to see us before, because they're in our filing system already.... And that appointment is scheduled as *a follow-up appointment*. And we know exactly why *the patient's* coming in because we've already seen them before. [Emphasis added.]

The reasonable inference from this testimony by Dr. Gross is that at the time Alyssha communicated with Dr. Gross's office on February 14 and 17, Hunter was not a "new patient," he was an existing ROP patient who had already been seen in the hospital and needed a follow-up appointment.

Maria Rodriguez, Dr. Gross's receptionist in February 1997, testified that Dr. Gross's office obtained phone numbers for patients when they called in to schedule an appointment. Sometimes, she would obtain the patient's address, "just to get the medical records started." When Rodriguez had time, she called to confirm appointments. If she knew what insurance the patient had, she would remind the patient to bring a referral form. Rodriguez testified that Dr. Gross's office had a policies and procedures manual, which re-

---

**4.** At trial, Dr. Gross denied receiving the February 19 referrals for Hunter because "[w]e have no record of these referrals ever having been received." But he was impeached with his deposition testimony that it was not safe to assume that the referrals were never received simply because the pink referral sheets were not located in his office. He testified that "they may have been sent. Referrals are

only good for 60 days. So they may have been received and discarded after they were expired." Dr. Yee testified that, although he did not remember sending this specific referral to Dr. Gross, his usual practice would be to fax or mail the referral or to have the patient come pick it up before the appointment.

quired that the parent be contacted by phone or postcard when a patient did not show up for an appointment. Although Dr. Gross testified that babies seen in the hospital were scheduled as follow-up appointments, not as new patients, Alyssha was not contacted by Dr. Gross's office concerning either of the appointments that Hunter missed.

Jimmie McMurray testified that in February 1997, she worked in Dr. Gross's office doing insurance billing. She said that after Dr. Gross performed a ROP initial evaluation, he completed a form that included the patient's name, address, and telephone number. He would bring that form back to his office and give it to McMurray. The ROP evaluation form for Hunter shows that "[Alyssha] Taylor [and] [Keith] Burt"[5] are his parents and provides a address and phone number for the patient. Dr. Gross's records concerning Hunter indicate that Hunter was a "preemie," i.e., a premature baby.

Dr. Yee knew monitoring the twins' vision was important, but he expected Dr. Gross to examine the twins and then to tell him when they needed to be seen again. The "Dear Parent" letter demonstrates Dr. Gross's agreement to do just that. The letter explains that an in-hospital eye examination is scheduled and that this exam is performed on babies meeting certain birth weight and prematurity standards. It states, "You will be contacted by *your baby's pediatric ophthalmologist* if any significant findings are detected which would in any way affect your baby's health or vision." The letter goes on to state, "In specific circumstances, *your pediatric ophthalmologist* may request another ophthalmologist consultant to also check you baby's eyes. Robert D. Gross, M.D., is the Pediatric Ophthalmologist who staffs our NICU." [Emphasis added.] Dr. Gross knew the neonatologist group was using this letter, and Dr. Gross told them "that that was fine with me."

I agree with the majority's recitation of historical Texas law that a medical malpractice claim is predicated on the existence of a physician-patient relationship. *See, e.g., St. John v. Pope*, 901 S.W.2d 420, 423 (Tex.1995). Where no prior relationship exists, the doctor must take some affirmative step to treat the patient before a relationship can be established. *Ortiz v. Shah*, 905 S.W.2d 609, 611 (Tex.App.-Houston [14th Dist.] 1995, writ denied); *Lopez v. Aziz*, 852 S.W.2d 303, 306 (Tex. App.-San Antonio 1993, no writ). Once such a relationship exists, however, the physician owes the patient a duty to treat him or her with the skills of a trained, competent professional, and a breach of that duty may give rise to a malpractice action. *Reynosa v. Huff*, 21 S.W.3d 510, 513 (Tex.App.-San Antonio 2000, no pet.).

Here, it is undisputed that an initial physician-patient relationship existed between Dr. Gross and Hunter with respect to Hunter's ROP. Consequently, I believe that the issues before us are whether the evidence proves as a matter of law that the relationship was terminated and whether the evidence, viewed in the light most favorable to Hunter, constitutes more than a scintilla of evidence of a continued physi-

---

**5.** Thus, both Hunter's referral form from Dr. Yee, which Dr. Gross may or may not have received, and Dr. Gross's own ROP screening form which Dr. Gross himself completed in the hospital and provided to his office personnel, showed that Hunter's parents were "[Alyssha] Taylor [and] [Keith] Burt." *Viewed in the light most favorable to Hunter,* there is not an "intervening identification issue" with Dr. Gross's office as to Hunter's last name as the majority contends. Maj. Op. at 227. Even Dr. Gross conceded his office should have checked under both last names and a reasonable inference exists that a newborn will use either his mother's or his father's last name.

cian-patient relationship with respect to Hunter's ROP. The cases relied upon by the majority, however, address only whether an initial physician-patient relationship was created, not whether an existing physician-patient relationship later continued or was terminated. *See, e.g., Majzoub v. Appling,* 95 S.W.3d 432, 437 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (op. on reh'g) (recognizing that no physician-patient relationship was created when "there was no prior physician-patient relationship between Mr. Majzoub and Dr. Appling," Dr. Appling never saw, talked to, or examined Majzoub, and Dr. Appling did not proffer a medical diagnosis of Majzoub's condition or make any medical decisions regarding Majzoub); *Jackson v. Isaac,* 76 S.W.3d 177, 182 (Tex.App.-Eastland 2002, pet. denied) (holding no physician-patient relationship was created when doctor had never examined patient and patient failed to "show up" for medical treatment because he died before first scheduled appointment with doctor); *Ortiz,* 905 S.W.2d at 611 (holding no physician-patient relationship was created when on-call doctor never examined patient, talked to him, or gave advice to anyone in emergency room about patient); *Day v. Harkins & Munoz,* 961 S.W.2d 278, 281 (Tex.App.-Houston [1st Dist.] 1997, no writ) (holding no physician-patient relationship was created when doctors who agreed only to provide emergency and first aid care to patrons at a concert never treated patient at concert). Consequently, these cases are factually distinguishable from the present case.

The *St. John* case is instructive. In *St. John,* an emergency room doctor phoned the hospital's on-call physician, Dr. St. John, a board-certified internist, and described the patient's symptoms. 901 S.W.2d at 421–22. Dr. St. John determined that the hospital was not equipped to treat the patient and recommended that the patient be referred to another hospital. *Id.* at 422. The supreme court held that the duty to treat a patient with proper professional skill flows from the consensual relationship between the patient and the physician. *Id.* at 423. The supreme court held that, as a matter of law, no physician-patient relationship existed between Dr. St. John and the patient because Dr. St. John never agreed to treat the patient. The supreme court explained:

> Although St. John listened to Suarez's description of Pope's symptoms, and came to a conclusion about the basis of Pope's condition, he did so for the purpose of evaluating whether he should take the case, *not as a diagnosis for a course of treatment.*

*Id.* at 424 (emphasis added). The supreme court further explained that "[i]t is only with a physician's consent, whether express or implied, that the doctor-patient relationship comes into being." *Id.* at 423.

Although *St. John* also involved the initial formation of the physician-patient relationship as opposed to the continuation or termination of that relationship, the supreme court's analysis focused on two factors that are also applicable to the continuation and termination issues: whether the doctor diagnosed the patient for a course of treatment and whether the doctor expressly or impliedly consented to accept the patient to administer the course of treatment. Focusing on these two factors in addressing whether the physician-patient relationship between Dr. Gross and Hunter continued following Dr. Gross's in-hospital examination and diagnosis of Hunter, more than a scintilla of evidence exists that Dr. Gross diagnosed Hunter for a course of treatment that he, Dr. Gross, intended to provide.

Dr. Gross examined Hunter in the hospital, diagnosed him with ROP, and knew

that Hunter required follow-up appointments with a pediatric ophthalmologist. Dr. Gross recommended a follow-up appointment in two weeks—with himself. He did not tell Alyssha or anyone at the hospital that the follow-up appointments should not be scheduled with him. Dr. Gross voluntarily approved a letter identifying himself as "your pediatric ophthalmologist," knowing the letter would be attached to Hunter's basinet in the hospital. Dr. Gross took Hunter's ROP screening form to his office so Hunter could be entered as an existing patient for ROP follow-up appointments. Alyssha called, scheduled, and rescheduled appointments for Hunter with Dr. Gross. Thus, more than a scintilla of evidence exists that, unlike Dr. St. John, Dr. Gross did see and evaluate the patient, i.e., Hunter, to diagnose him for a course of treatment.

Likewise, more than a scintilla of evidence exists that Dr. Gross either expressly or impliedly consented to the continuation of his physician-patient relationship with Hunter. Dr. Gross and Dr. Burke both recognized that the standard of care required a pediatric ophthalmologist to conduct follow-up appointments with Hunter. The "Dear Parent" letter approved by Dr. Gross constitutes some evidence that Dr. Gross voluntarily *continued to be* Hunter's pediatric ophthalmologist with respect to the ROP follow-up appointments. The majority discounts the "Dear Parent" letter, noting that Hunter's parents did not rely upon it. Maj. Op. at 224–25. But viewed in the light most favorable to Hunter, this letter, approved by Dr. Gross, nonetheless constitutes evidence that Dr. Gross perceived his physician-patient relationship with Hunter with respect to the treatment of Hunter's ROP as ongoing, that he consented to the ongoing nature of the relationship, and that he did not intend to terminate the relationship when Hunter left the hospital. Dr. Burke

testified that it was Dr. Gross's responsibility to make sure that the follow-up exams on Hunter were carried out—further evidence of the continuing nature of Dr. Gross's relationship with Hunter.

Additionally, the fact that Dr. Gross utilized a specific form when he performed in-hospital ROP exams on premature newborns, provided that form to his office insurance billing employee, and had the newborn's information entered into his computer system as an existing patient likewise constitutes some evidence that Dr. Gross's physician-patient relationship with Hunter continued. Dr. Gross himself testified that for a follow-up appointment "we know exactly why *the patient's* coming in because we've already seen them before," i.e., that an ongoing physician-patient relationship exists. Finally, the fact that Dr. Gross's office followed a specific procedure when a premature infant missed a scheduled ROP follow-up appointment—calling the parent or sending a card—constitutes more than a scintilla of evidence of Dr. Gross's consent to the continuation of his physician-patient relationship with these premature babies, including Hunter.

### B. Termination Not Established as a Matter of Law

There is also some evidence that Alyssha terminated the physician-patient relationship between Dr. Gross and Hunter. She did not reschedule the February 28 appointment that Hunter missed when he was in the hospital with a virus. Eventually, in June 1997, Hunter finally obtained an ROP follow-up examination with another pediatric ophthalmologist where he was diagnosed as legally blind. But, this one fact—Alyssha's failure to reschedule the February 28 appointment after scheduling the February 17 and February 28 appointments—does not establish termination as a matter of law in light of the evidence

outlined above supporting the deemed finding of a continued physician-patient relationship between Dr. Gross and Hunter. Because the jury could have reasonably concluded from the evidence that the physician-patient relationship between Dr. Gross and Hunter continued, termination was not conclusively established as a matter of law. *See, e.g., Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994) (recognizing that the test for conclusive evidence is similar to the test for no evidence in that the court asks whether reasonable minds could differ about the fact determination to be made by the jury).

The trial court here found, and the parties agreed, that a physician-patient relationship existed as a matter of law between Dr. Gross and Hunter with respect to Hunter's ROP at the time of the in-hospital examination. Based on the record before us, viewing all of the evidence in the light most favorable to Hunter and disregarding all contrary evidence and inferences, I would hold that the evidence is legally sufficient to support the deemed finding that this relationship continued after Dr. Gross's in-hospital examination of Hunter. I would also hold that the evidence does not conclusively establish termination of the physician-patient relationship between Hunter and Dr. Gross because reasonable minds can differ on this issue. I would therefore overrule Dr. Gross's first issue and proceed to address the other issues raised by Dr. Gross in this appeal.

## C. Legal Sufficiency Review Does Not Result in Expanded Duty

In its conclusion concerning Dr. Gross's appeal, the majority theorizes that to hold sufficient evidence exists supporting the deemed finding that the physician-patient relationship between Dr. Gross and Hunter continued would "expand the duty of continued care to all patients who are seen at hospitals by consulting physicians beyond the hospital setting." Maj. Op. at 227. I must respectfully disagree. Two main facts remove this case from the general category of cases referenced by the majority: cases where a "duty of continued care [would be owed] to all patients who are seen at hospitals by consulting physicians beyond the hospital setting." Maj. Op. at 227. First, the "Dear Patient" letter approved by Dr. Gross specifically labeling him as "your pediatric ophthalmologist" removes this case from this general category of cases. Second, the guidelines set by The American Academy of Pediatrics, the American Association for Pediatric Ophthalmology and Strabismus, and the American Academy of Ophthalmology, and recognized by Dr. Gross as constituting the standard of care likewise remove this case from this general category of cases referenced by the majority. The standard of care requires that infants with ROP, like Hunter, "be seen at least every 1 to 2 weeks until normal vascularization proceeds to Zone III or the risk of attaining threshold conditions is passed." Thus, a pediatric ophthalmologist, like Dr. Gross, making a diagnosis of ROP in the hospital knows when the diagnosis is made that the standard of care requires very rapid follow-up appointments. A doctor who sees a patient in the hospital, diagnoses the patient for a course of treatment, holds himself out in writing as the patient's doctor, recommends follow-up treatment for the patient with himself, understands that the standard of care requires immediate follow-up treatment, and is said by an expert to be responsible for taking steps to make sure the follow-up treatment occurs, is not simply a consulting physician. I cannot agree that holding the evidence legally sufficient to support the deemed finding of a continued physician-patient relationship between Dr. Gross and Hunter would con-

stitute a expansion of the duties imposed on any consulting doctor who does not diagnose a patient for a course of treatment, does not hold himself out in writing as the patient's doctor, does not recommend follow-up treatment for the patient with himself, and does not admit that the standard of care requires that follow-up treatment occurs.

### III. CONCLUSION

Because more than a scintilla of evidence exists supporting the jury's implied finding that Dr. Gross's physician-patient relationship with Hunter continued after Dr. Gross's in-hospital examination of Hunter, and because the evidence does not conclusively establish termination of that relationship, I would overrule Dr. Gross's first issue and proceed to address his remaining issues on rehearing en banc.

Before the court en banc.

## ORDER ON MOTION FOR REHEARING AND MOTION FOR REHEARING EN BANC AS TO ALL SAINTS INTEGRATED AFFILIATES D/B/A ALL SAINTS MEDICAL ASSOCIATES AND STEPHANIE PERDUE, M.D.

TERRIE LIVINGSTON, Justice.

We have considered appellees' "Motion for Rehearing and Motion for Rehearing En Banc as to All Saints Integrated Affiliates d/b/a All Saints Medical Associates and Stephanie Perdue, M.D." It is the opinion of the court that said motions for rehearing and rehearing en banc should be and are hereby denied.

The clerk of this court is directed to transmit a copy of the order to the attorneys of record.

EN BANC

SAM J. DAY, J. (Retired, Sitting by Assignment)

DAUPHINOT, J., would grant the motion for rehearing en banc.

1. See TEX.R.APP. P. 41.2(c).

## ORDER ON MOTION FOR REHEARING AND MOTION FOR REHEARING EN BANC AS TO ROBERT GROSS, M.D.

TERRIE LIVINGSTON, Justice.

We have considered appellees' "Motion for Rehearing and Motion for Rehearing En Banc as to Robert Gross, M.D." It is the opinion of the court that said motions for rehearing and rehearing en banc should be and are hereby denied.

The clerk of this court is directed to transmit a copy of the order to the attorneys of record.

EN BANC

SAM J. DAY, J. (Retired, Sitting by Assignment)

CAYCE, C.J.; DAUPHINOT, GARDNER, and WALKER, JJ., would grant the motion for rehearing en banc.

GARDNER, J., filed a dissenting opinion.

ANNE GARDNER, Justice, dissenting from denial of motion for rehearing en banc as to Robert Gross, M.D.

I respectfully dissent from the denial of Appellees' motion for rehearing en banc as to Dr. Gross. First, I simply believe this case presents an issue of extraordinary circumstances requiring an en banc review by this Court.[1] That issue is whether the physician-patient relationship continued during the pertinent time in question after Dr. Gross performed the ROP screen on Hunter and provided his report and recommendations to Dr. Smith. This appears to be a case of first impression involving an increasingly common issue of the extent of a physician-patient relationship arising out of consultation by a specialist in the hospital setting. An appellate court in another jurisdiction recently noted "the in-

creasing complexity of the managed health care system, in which patients routinely are diagnosed by pathologists or radiologists or other consulting physicians" in determining whether a physician-patient relationship exists.[2]

There appears to be no reported case involving a disputed issue of whether a physician-patient relationship with a consulting or on-call specialist extended *beyond* an examination or treatment in the hospital setting; much less is there a case dealing with this issue involving additional factors such as those present here. The importance and novel nature of the issue is underscored by the stated reluctance of the panel's majority opinion to "expand the duty of continued care to all patients who are seen at hospitals by consulting physicians beyond the hospital setting based solely upon the fact that they were seen by the physician in the hospital" because such a holding would create a never-ending duty. *See* Maj. Op. at 227–28. While I agree that the sole factor of just seeing a patient as a consulting physician may not be enough, this case involves additional factors that should be considered together to determine whether the evidence establishes an extended physician-patient relationship here. And I do not believe the majority's fear is well-founded that the creation of a never-ending relationship would be the necessary result of holding that a fact issue exists in this case.

Dr. Gross does not dispute that a physician-patient relationship was created with Hunter by his agreement with the hospital to act as the consulting pediatric ophthalmologist, his participation in the Burts' managed care plan, and his taking of affirmative action to perform the ROP screen-

ing on Hunter in the hospital. But this case involves more than a single consultation. This case involves also setting up an appointment for a "follow-up" office visit with Dr. Gross after Hunter's discharge, a call from Dr. Gross's office to remind the mother of the appointment and need for a referral, a rescheduling of the appointment, setting up a chart on Hunter by Dr. Gross at his office with a view toward follow-up visits, and the "Dear Parents" letter that arguably refers to Dr. Gross as the pediatric ophthalmologist who was to contact the parents regarding any significant finding.

Additionally, recognizing that the evidence raised an issue of fact as to the existence of a continuing physician-patient relationship in this case would not create a never-ending duty because the context is that of a condition, Stage I ROP, that requires follow-ups weekly or every two weeks as mandated by a Joint Statement by the American Academies of Pediatrics, Pediatric Ophthalmology and Strabismus, and Ophthalmology only during a finite period of time until "threshold" is reached and the condition may be successfully treated, or until time for development of the condition and risk for untreated blindness passes.

I also believe this court should resolve en banc the issue of who had the burden of proof on the issue of the continuation of the physician-patient relationship. The Burts and the dissenting member of the panel urge that the issue is one of "termination," an affirmative defense on which Dr. Gross bore the burden of proof and submission. Dr. Gross, however, contends that his physician-patient relationship with Hunter was merely limited in time, ending

**2.** *Kelley v. Middle Tenn. Emergency Physicians, P.C.,* 133 S.W.3d 587, 596 (Tenn.2004) (holding physician-patient relationship could be based upon "implied consent" as to consultation by emergency room physician with on-call cardiologist covering for patient's absent treating cardiologist).

on February 8, 1997, after he had screened Hunter and furnished his findings and recommendations to Dr. Smith. He denies that it continued or was extended after Hunter's discharge.

A plaintiff has the burden to prove four elements in a medical malpractice cause of action: (1) a duty owed by the physician to act according to a certain standard of care; (2) breach of the applicable standard; (3) injury; and (4) proximate cause.[3] The duty normally flows from the physician-patient relationship.[4] Although duty is a question of law, the predicate existence of facts establishing a physician-patient relationship at the time of the breach may be a question of fact, and the existence of a physician-patient relationship is essential to a plaintiff's cause of action for medical malpractice.[5] As such, as stated by Justice Peeples in *Rampel v. Wascher*, it is the patient's burden to prove the existence of the physician-patient relationship in a medical malpractice case when that issue is disputed.[6]

Once the initial physician-patient relationship is established, the physician's duty ordinarily extends to treating the patient as long as attention is needed or until the patient discharges the doctor or the patient is given reasonable notice and an opportunity to secure other medical attention.[7] Because an initial physician-patient relationship was established between Dr. Gross and Hunter while Hunter was still in the hospital, it follows that Dr. Gross must accept the duties that flow from that relationship.[8] Indeed, it has been held that it is the plaintiff's burden to request issues establishing that termination of a relationship by a physician was negligent or wrongful and resulted in damages.[9] In contrast, here the only dispute was whether the relationship continued after the screening. Thus, it would appear that the correct issue was whether the physician-patient relationship existed at the times of the alleged breaches of duty. I would hold with the majority of the panel that the burden was on the Burts to establish the

**3.** *Majzoub v. Appling*, 95 S.W.3d 432, 436 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (op. on reh'g); *Lection v. Dyll*, 65 S.W.3d 696, 703–04 (Tex.App.-Dallas 2001, pet. denied) (op. on reh'g).

**4.** *See St. John v. Pope*, 901 S.W.2d 420, 423 (Tex.1995); *Jackson v. Isaac*, 76 S.W.3d 177, 179 (Tex.App.-Eastland 2002, pet. denied); *Lopez v. Aziz*, 852 S.W.2d 303, 305–06 (Tex.App.-San Antonio 1993, no writ); *Salas v. Gamboa*, 760 S.W.2d 838, 840 (Tex.App.-San Antonio 1988, no writ) (stating that duty flows from relationship).

**5.** *See St. John*, 901 S.W.2d at 423; *Jackson*, 76 S.W.3d at 179 (both noting that no duty exists absent physician-patient relationship); *Lection*, 65 S.W.3d at 704 (stating that physician is liable only where there is physician-patient relationship); *see also Kelley*, 133 S.W.3d at 592 (noting and citing cases in which courts have recognized existence of relationship as "essential" or "necessary" element of plaintiff's medical malpractice cause of action); *accord Weaver v. Univ. of Mich.*

*Bd. of Regents*, 201 Mich.App. 239, 506 N.W.2d 264, 265 (1993) (stating that professional relationship is "legal prerequisite" to cause of action for medical malpractice).

**6.** 845 S.W.2d 918, 921 (Tex.App.-San Antonio 1992, writ denied) (citing *Wilson v. Winsett*, 828 S.W.2d 231, 232 (Tex.App.-Amarillo 1992, writ denied) and *Salas*, 760 S.W.2d at 840).

**7.** *Lee v. Dewbre*, 362 S.W.2d 900, 902 (Tex. Civ.App.-Amarillo 1962, no writ); *Urrutia v. Patino*, 297 S.W. 512, 516 (Tex.Civ.App.-San Antonio 1927, no writ); *see generally*, 1 J. HADLEY EDGAR, JR. & JAMES B. SALES, TEXAS TORTS & REMEDIES § 11.01[1][c] (2004).

**8.** *See Wheeler v. Yettie Kersting Mem'l Hosp.*, 866 S.W.2d 32, 40 (Tex.App.-Houston [1st Dist.] 1993, no writ).

**9.** *Traylor v. Goulding*, 497 S.W.2d 468, 472 (Tex.Civ.App.-Houston [1st Dist.] 1973), *rev'd on other grounds*, 497 S.W.2d 944 (Tex.1973).

continuation of the existence of the physician-patient relationship at the time of the alleged breach of duty by Dr. Gross, rather than placing the burden on Dr. Gross to establish that the relationship was terminated.[10]

Under rule 279, the trial court may make an express finding in support of the judgment if a charge was submitted on a cause of action or defense consisting of more than one element, if the party *with the burden of proof* on the cause of action did not request a missing element, if the opposing party fails to object to the missing element, if the missing element is "necessarily referable" to the submitted cause of action or defense, and if there is factually sufficient evidence to support the missing element.[11] By not objecting, the parties waive a jury finding on the omitted issue, but they implicitly agree to submit the issue to the trial court.[12] If the trial court does not make an express finding after trial, the appellate court will "deem" the omitted element found in support of the judgment if there is legally and factually sufficient evidence to support it.[13] If the opposing party objected to the missing element, the element cannot be deemed found in support of the judgment, and the absence of a finding forecloses the right of recovery or defense on the theory submitted unless the missing element is established as a matter of law.[14]

Because the existence of the physician-patient relationship was not requested and there was no objection, that element must be "deemed" found in support of the judgment unless there was legally or factually insufficient evidence to support such a deemed finding. Both expressly and by virtue of the language of that rule, Dr. Gross retained the right to challenge the deemed finding after verdict based on legally and factually insufficient evidence.[15] Whether a physician-patient relationship exists is particularly fact-driven and is most often held to be a fact issue for the jury under the particular facts and circumstances of each case.[16] For all of these

10. The period in issue is the period after the ROP screening of February 8, and after Hunter's discharge, during which Hunter could have been monitored and treated for the ROP, at least as testified to by the Burts' experts. I believe it is clear that the Burts terminated any relationship when they decided after the second missed appointment with Dr. Gross to seek care from another pediatric ophthalmologist. But by that time the window of opportunity had closed.

11. Tex.R. Civ. P. 279; *Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 565 (Tex.2002); *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 529 (Tex.1997); *Wal–Mart Stores, Inc. v. Renteria,* 52 S.W.3d 848, 850 (Tex.App.-San Antonio 2001, pet. denied).

12. *Gulf States,* 79 S.W.3d at 565.

13. *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 437 (Tex.1995); *Ramos v. Frito–Lay, Inc.,* 784 S.W.2d 667, 668 (Tex.1990).

14. *Olivo,* 952 S.W.2d at 529; *McKinley v. Stripling,* 763 S.W.2d 407, 410 (Tex.1989).

15. Rule 279 expressly states that "factually sufficient evidence" is a prerequisite to a deemed finding as follows:
    [If] one or more of such elements are omitted from the charge, without request or objection, *and there is factually sufficient evidence to support a finding thereon ....* such omitted element or elements shall be deemed found by the court in such manner as to support the judgment.
    Tex.R. Civ. P. 279 (emphasis added).

16. *See Rampel,* 845 S.W.2d at 920; *see also Kelley,* 133 S.W.3d at 598 (noting that whether physician-patient relationship exists is generally a question of fact in medical malpractice cases); *Irvin v. Smith,* 272 Kan. 112, 31 P.3d 934, 941 (2001) (stating whether that relationship exists is generally an issue for jury); *See generally,* James L. Rigelhaupt, Jr., Annotation, *What Constitutes Physician–Patient Relationship for Malpractice Purposes?,* 17 A.L.R.4th 132 (1982 & Supp.2004).

reasons, I would grant the motion for rehearing en banc as to Dr. Gross.